**CHALKBOARD, INC.; Karen M. Hoyt, Plaintiffs–Appellees,**

v.

**Susan BRANDT; Boyd Dover; Lucinda Blair; Andy Harclerode; Sherry Meredith; Lloyd Novick; Douglas X. Patino; Darwin Cox, Defendants–Appellants.**

No. 88–1523.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 15, 1988.

Decided July 13, 1989.

Amended May 11, 1990.

Anthony B. Ching, Atty. General's Office, Phoenix, Ariz., for defendants-appellants.

Elliott Glicksman, Stompoly & Stroud, Tucson, Ariz., for plaintiffs-appellees.

Before PREGERSON, CANBY and BEEZER, Circuit Judges.

CANBY, Circuit Judge:

The plaintiffs, Chalkboard, Inc., a day care center, and its owner-operator Karen Hoyt[1] brought this civil rights action in District Court for money damages against officials of the Arizona Department of Health Services ("DHS"), and the Arizona Department of Economic Security ("DES"), agencies responsible for child day care programs. The claim is based on defendants' actions in summarily suspending Chalkboard's license to operate a day care center. The defendants moved for summary judgment on grounds of absolute and qualified immunity. The District Court denied the motion and the defendants appeal. We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1291. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *Kraus v. County of Pierce,* 793 F.2d 1105, 1107–8 (9th Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987).

We review de novo the denial of defendants' motion for summary judgment. *Kraus v. County of Pierce,* 793 F.2d at 1106–07. We affirm.

**1.** Hereafter we refer to both plaintiffs as "Chalk-

## FACTUAL BACKGROUND

On October 10, 1985, the Tucson Police Department received a complaint from a local citizen that her young daughter had been sexually abused while at Chalkboard by a teacher on its staff. The Police notified the Office of Child Protective Services, a unit of DES, and defendant Susan Brandt of DES began an investigation. On the same day, DHS, the agency responsible for licensing and monitoring day care centers, was notified and also initiated an investigation.

During the next several days Brandt learned from interviews with students and one former employee of Chalkboard of at least one other complaint of sexual abuse concerning the same teacher. She also learned of several complaints of physical abuse, including the disciplining of children by tying their hands behind their backs with sheets, placing the children on a high shelf, or locking them in a shed or outside of the center. The former employee testified at a deposition that she had informed the investigators that the incidents of physical abuse had stopped nearly two months prior to the investigation. These accusations were also encountered by two investigators from DHS, defendants Sherry Meredith and Lucinda Blair. The DHS investigators learned from Hoyt that the teacher accused of the sexual abuse incidents had been suspended pending the outcome of the investigation. While at Chalkboard, the DHS investigators also noted that the day care center was over capacity, a problem of which Chalkboard had already been warned in 1983.

On October 16, 1985, defendant Boyd Dover, Deputy Director of DHS, issued an order summarily suspending Chalkboard's license on the grounds of the alleged sexual molestation, the alleged physical abuse, and overcrowding. On the following day, an administrator of DES stood on the sidewalk in front of Chalkboard to inform parents of the closure and advise them of alternative day care centers. The press was also present at this time. Prior to Chalkboard's closure, approximately 85% of

board".

its enrollment was under contract with DES. The license suspension automatically resulted in cancellation of these contracts as well as Chalkboard's Department of Agriculture funding for food programs.

On the day of the suspension, Hoyt was notified of an administrative hearing on the license suspension to be scheduled in the near future. This hearing was subsequently scheduled for October 24, 1985, eight days after the suspension. Immediately after the suspension, however, Chalkboard had filed an action in Arizona Superior Court seeking an injunction. On October 18, at a hearing in state court, Chalkboard sought leave to withdraw the complaint, which was granted. On October 23, 1985, this action was filed. On October 24, Chalkboard appeared at the administrative hearing and stipulated to a postponement. Ultimately, Chalkboard elected not to attend the hearing.

### ABSOLUTE IMMUNITY

■ Defendants first argue that they are absolutely immune. In general, executive officials are protected from constitutional claims only by qualified immunity. *Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1977). In certain instances, however, executive officials may be entitled to absolute immunity, but such instances are limited "to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of public business." *Id.* The burden is on the official seeking immunity to show that the immunity is "justified by overriding considerations of public policy." *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988).

■ The Supreme Court has made clear that absolute immunity depends upon the particular function performed by the official. *Butz,* 438 U.S. at 508, 98 S.Ct. at 2911. The question is not one of status, but of the "nature of the responsibilities of the individual official." *Cleavinger v. Saxner,* 474 U.S. 193, 201, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985). The prime categories of executive officials that are entitled

to absolute immunity are those whose functions parallel the functions of judges and prosecutors. *Butz,* 438 U.S. at 511–15, 98 S.Ct. at 2913–15; *see Schlegel v. Bebout,* 841 F.2d 937, 942 (9th Cir.1988). It is these categories into which defendants seek to fit themselves.

■ This case arises, however, out of the DHS officials' summary closure of Chalkboard. To the extent that such action may be judicial or prosecutorial, it is essential that this function be assigned by state law to the DHS. A judge who wrongfully sentences an accused to prison is absolutely immune; a policeman who takes it upon himself to perform that function clearly is not. We must therefore examine whether the DHS officials were placed, under state law, in the functions equivalent to those of judge or prosecutor with regard to Chalkboard's summary closure.

■ The DHS officials contend that they were authorized summarily to close Chalkboard under Ariz.Rev.Stat.Ann. § 41–1064(C)(1988) [2], which states:

No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the action, the agency provides the licensee with notice and an opportunity for a hearing in accordance with this chapter. If the agency finds that public health, safety or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined.

This provision is part of the Arizona Administrative Procedure Act, which forms a general set of rules applicable to administrative agencies in the absence of a more specific statutory structure. *See Didlo v. Talley,* 21 Ariz.App. 446, 448, 520 P.2d 540, 542 (1974). Chalkboard contends, and the district court held, that DHS was governed by just such a specific statutory structure that included a provision for obtaining ex-

---

**2.** This section was formerly codified at Ariz.Rev. Stat.Ann. § 41–1012(C).

pedited closure of day care centers. Ariz. Rev.Stat.Ann. § 36–886.01 (1986) provides:

> When the department has reason to believe that a day care center is operating under conditions that present possibilities of serious harm to children, the department shall notify the county attorney or the attorney general, who shall immediately seek a restraining order and injunction against the day care center.[3]

The district court concluded that the two provisions were in conflict and that Arizona law dictates that statutory conflicts be settled in favor of the more specific statute. See Arden–Mayfair, Inc. v. Department of Liquor Licenses and Control, 123 Ariz. 340, 342, 599 P.2d 793, 795 (1979); Arizona State Tax Commission v. Phelps Dodge Corporation, 116 Ariz. 175, 177, 568 P.2d 1073, 1075 (1977) (en banc), cert. denied, 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978). The DHS officials maintain that there was no conflict between Ariz.Rev. Stat.Ann. § 41–1064(C) and Ariz.Rev.Stat. Ann. § 36–886.01, and that DHS was free to use either provision.

While the Arizona Supreme Court has never defined the relationship between the two statutes, its decisions in Arden–Mayfair and Phelps Dodge, supra, render the officials' view implausible. We cannot accept the contention that a general purpose summary-closure provision enacted years earlier remains at the disposal of the DHS officials when the state has adopted a more recent and specific statutory scheme which provides for both routine and expedited methods of suspending the license of a day care center and which does not permit summary action by agency officials.

Thus, Arizona has provided, under section 36–886.01, for prosecutors and judges to effect a summary closure of day care centers. It is entirely possible that DHS officials who directly serve that process in one way or another will be absolutely immune. See Coverdell v. Department of Social and Health Services, 834 F.2d 758, 762–64 (9th Cir.1987) (social worker seeking and obtaining a child dependency order is absolutely immune). But in by-passing the statutorily mandated procedure entirely,[4] and arrogating to themselves a function that state law denies them, defendants have not served in a judicial or prosecutorial capacity that conferred absolute immunity.

Our precedent supports our conclusion that state law must authorize the prosecutorial or judicial function to which absolute immunity attaches. In Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675 (9th Cir.1984), we held a prosecutor to be absolutely immune in releasing certain evidence after trial, pointing out that he acted "well within his authority as a deputy district attorney, empowered to preserve or to release" the evidence. Id. at 678. Similarly, in Coverdell, we emphasized that the absolutely immune social worker's action in seeking a court order was "not only within the scope of her authority under Washington law, [but] may well have been required." Coverdell, 834

---

**3.** This procedure is considerably more expeditious than the normal license suspension procedure under the same statutory scheme, Ariz.Rev. Stat.Ann. § 36–889. The latter statute provides:

> The department may revoke or suspend the license of any person for a violation of applicable law or regulations. The department shall afford the affected licensee the right of a hearing by serving upon the licensee at least thirty days' notice, by registered mail with return receipt requested, to show cause before the director, upon a date to be fixed in the notice, why the license should not be suspended or revoked in accordance with the regulations of the department and the provisions of law. The notice shall set forth the act or acts constituting the violation and shall refer to the provisions of the applicable law or regulations alleged to be violated. If the licensee

does not respond to the written notice within the period provided in the notice, the department shall revoke or suspend the license. If the licensee, within the period provided by the notice, rectifies the acts constituting the violation, the department may withdraw the notice of suspension or revocation.

**4.** Cf. Meyers v. Contra Costa County Dep't of Social Services, 812 F.2d 1154, 1157 (9th Cir. 1987), cert. denied, 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987) (absolute immunity denied to social worker who ordered father away from his home; "[r]ather than contributing to an informed judgment by an impartial decisionmaker as an advocate, [social worker] acted unilaterally prior to the operation of the judicial process").

F.2d at 764. Here, in summarily closing Chalkboard without a hearing, DHS was not acting in a role assigned to it by state law.[5] The district court was correct in denying absolute immunity.

## QUALIFIED IMMUNITY

■ The fact that state law did not put the defendants in the position of prosecutors or judges does not, however, necessarily deprive them of all immunity. *See Meyers,* 812 F.2d at 1157–58. Executive officials are protected against actions for damages by the doctrine of qualified immunity unless "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ The constitutional violation alleged in this case is the deprivation of property without due process of law. While the right to due process is clearly established under the fourteenth amendment, the issue of qualified immunity cannot be resolved at such a high level of generality. *Anderson v. Creighton,* 483 U.S. at 639, 107 S.Ct. at 3038. Instead, the question for our determination is whether, in light of clearly established law and the circumstances of this particular case, reasonable officers would have known that it was not lawful for them to suspend Chalkboard's license and close the facility without prior notice and an opportunity for Chalkboard to respond. *See id.* at 640, 107 S.Ct. at 3039.

The defendants do not dispute that Chalkboard's license constitutes an entitlement amounting to a property interest. Nor do they dispute that a deprivation occurred. The questions that divide the parties are what process was due, and what process should reasonable officers have known to be due. The focus is on the need for some form of predeprivation review.

We begin with the proposition that a requirement of predeprivation process is the norm:

An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313 [70 S.Ct. 652, 656, 94 L.Ed. 865] (1950). We have described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.' *Boddie v. Connecticut,* 401 U.S. 371, 379 [91 S.Ct. 780, 786, 28 L.Ed.2d 113] (1971) (emphasis in original); see *Bell v. Burson,* 402 U.S. 535, 542 [91 S.Ct. 1586, 1591, 29 L.Ed.2d 90] (1971).

*Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 [105 S.Ct. 1487, 1493, 84 L.Ed.2d 494] (1985). This principle is so well established that reasonable officers would have known of it.

■ The next question, then, is whether reasonable officers would have known that the usual requirement of predeprivation process applied in the circumstances of this case. To determine whether the administrative process employed by defendants was constitutionally deficient and, if so, whether it was *clearly* deficient, we must begin by considering three distinct factors: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation through the procedures used and the value of additional procedures; and (3) the government's interest, including the function involved and the burdens that additional procedural requirements would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ A balancing of these factors, as they were applied in *Mathews* and, subsequently, in *Loudermill,* leads us to conclude that the administrative procedures

---

5. We thus distinguish cases such as *Horwitz v. Bd. of Medical Examiners,* 822 F.2d 1508 (10th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987), and *Austin Municipal Securities v. Nat'l Ass'n of Securities Dealers,* 757 F.2d 676 (5th Cir.1985), where members of boards *exercising statutorily-delegated authority* to suspend professional licenses summarily were accorded absolute immunity.

followed by defendants in this case could not reasonably have been believed to meet constitutional requirements. First, the private interest was clearly substantial. Plaintiff Hoyt was the owner and operator of Chalkboard, and the license was essential to its entire business. Indeed, summary suspension on the ground of child abuse was likely to have severe and permanent consequences for plaintiffs regardless of the ultimate resolution of the charges. As the Supreme Court has noted in the case of a driver's license, "[o]nce licenses are issued ... their continued possession may become essential in the pursuit of a livelihood." *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971). The private interest here was similarly high.

The risk of erroneous deprivation in cases like Chalkboard's is also high. Whether or not instances of child abuse have occurred, and whether public health, safety and welfare require emergency action, are delicate judgments depending on credibility of witnesses and assessment of conditions not subject to measurement. The risk of error is considerable when such determinations are made after hearing only one side. *See Loudermill*, 470 U.S. at 543 & n. 8, 105 S.Ct. at 1493 & n. 8. Chalkboard's case is consequently quite different from those cases invoked by defendants where the factual issue to be determined was susceptible of reasonably precise measurement by external standards. *See, e.g., Dixon v. Love*, 431 U.S. 105, 113, 97 S.Ct. 1723, 1727, 52 L.Ed.2d 172 (1977) (suspension of driver's license when convicted of offenses totalling predetermined number of points); *Mackey v. Montrym*, 443 U.S. 1, 14, 99 S.Ct. 2612, 2619, 61 L.Ed.2d 321 (1979) (suspension of driver's license upon refusal to take breathalyzer test); *Barry v. Barchi*, 443 U.S. 55, 65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) (suspension of horse trainer's license predicated on chemical testing of horses for which trainer responsible). Similarly distinguishable is *Math-*

*ews v. Eldridge* itself, where the issue was whether a worker was disabled by a medically determinable physical or mental impairment. "This is a more sharply focused and easily documented decision than the typical determination of welfare entitlement." *Id.* 424 U.S. at 343, 96 S.Ct. at 907. Chalkboard's case is closer to *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), in which the Court required an evidentiary hearing prior to termination of welfare benefits. The risk of error without a hearing was great, and the value of a hearing clear, because "a wide variety of information may be deemed relevant, and issues of witness credibility and veracity often are critical to the decision-making process." *Mathews*, 424 U.S. at 343–44, 96 S.Ct. at 907 (describing *Goldberg*); *see also Loudermill*, 470 U.S. at 543–44, 105 S.Ct. at 1493–94.

The final factor in the *Mathews* analysis—the government's interest, including the function involved and the burdens that additional procedural requirements would entail—also militates, on balance, in favor of a requirement of predeprivation notice and an opportunity to respond. The key element, as we will show, is that defendants failed to follow the emergency injunction procedures specified by the legislature, and instead effected the summary suspension themselves.

The defendants contend that the summary suspension did not violate procedural due process because swift action was needed to protect the welfare of children. The state's interest in protecting children is undeniably great. Chalkboard strongly disputes, however, the existence of an emergency, and the facts are sufficiently in dispute to preclude resolution of that issue on summary judgment.[6] The defendants urge, however, that there is no need to establish an emergency in this particular instance; it is sufficient that the action taken was of a *category* that justifies dispensing with the normal due process re-

---

6. We have noted that "[i]n a case where patient welfare is in immediate jeopardy or where the effective functioning of the hospital is severely threatened, a hospital might well be justified in

immediate termination [of a physician] with the informal hearing procedures held shortly thereafter." *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361, 369 n. 20 (9th Cir.1976).

quirement of predeprivation notice and opportunity to respond. Defendants rely on our recent decision in *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1989), where we held that due process was not violated by a system of summary suspension of bulk fuel permits where swift action was necessary to protect the public health and safety. We stated that "the relevant inquiry is not whether a suspension should have been issued in this particular case, but whether the statutory procedure itself is incapable of affording due process." *Id.* at 1318 (paraphrasing *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 302, 101 S.Ct. 2352, 2373, 69 L.Ed.2d 1 (1981)).

*Soranno's Gasco* and *Virginia Surface Mining* are easily distinguishable, however. In both cases, the courts were constrained to yield to *legislative* judgments regarding the threat to the public interest and the need for summary action. In *Soranno's Gasco*, we said:

> The California legislature has determined that swift administrative action may be necessary in order to protect the public health and safety from violations of the state's pollution control regulations. *We are not in a position to second-guess that legislative determination.*

874 F.2d at 1318 (emphasis added). Similarly, in *Virginia Surface Mining*, the Supreme Court held that the standards established by a governing statute sufficiently guided administrative discretion in taking emergency action prior to hearing. *Virginia Surface Mining*, 452 U.S. at 301–02, 101 S.Ct. at 2373–74.

In our case, however, the defendants chose *not* to follow the procedure specified by the state legislature for dealing with "conditions that present possibilities of serious harm to children." Ariz.Rev.Stat.Ann. § 36–886.01 (1986). That statute, as we have already pointed out, requires the Department of Health Services to notify the county attorney or attorney general, who then must seek a restraining order and injunction from a court. *Id.* A restraining order may be granted without notice only upon a clear showing that irreparable inju-

ry will result before the opposing party can be heard, and upon certification of efforts to give notice or of reasons why it should not be required. Ariz.R.Civ.P. 65(d) (Supp. 1988).

Thus the state itself has specified the kind of emergency treatment required to safeguard the interests of its children. We are not entitled to second-guess that legislative determination, *Soranno's Gasco*, 874 F.2d at 1318, and neither are the defendants.

Because Arizona has provided procedures offering additional procedural protections, requiring notice and hearing in the absence of a showing of actual emergency, it follows that the burdens of such additional procedures are not a substantial factor in the *Mathews* balance. The state itself has found the burdens acceptable.

We conclude, therefore, that under a *Mathews* analysis, Chalkboard was entitled to notice and some form of opportunity to respond prior to the summary suspension of its license by the defendants.

We also conclude that reasonable officials would have known that the summary suspension effected in this case violated Chalkboard's due process rights. We assume that officials are aware of available decisional law. *Ward v. County of San Diego*, 791 F.2d 1329, 1332 (9th Cir.1986), *cert. denied*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). It was clear at the time of Chalkboard's suspension that "some pretermination opportunity" to respond was required before deprivation of a property interest. *Loudermill*, 470 U.S. at 542, 105 S.Ct. at 1493. The state legislature had also made clear its specified procedure for dealing with emergencies potentially threatening the welfare of children in day care centers. In ignoring these procedures and summarily suspending Chalkboard's license without notice or an opportunity to respond, reasonable officials would have known that their actions were not lawful. It is not the rule that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ..."; it is enough that "in the light of pre-existing

law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. at 3039; *see, Wood v. Ostrander*, 851 F.2d 1212, 1217 (9th Cir.1988).

We agree with the district court that, on the showing made upon motion for summary judgment, the unlawfulness of defendants' actions was apparent. Defendants accordingly failed to establish that they were entitled to judgment as a matter of law on the ground of qualified immunity. We therefore affirm the order of the district court denying defendants' motion for summary judgment. That is the only issue before us on this interlocutory appeal; we express no opinion, of course, on the proper direction of future proceedings or on the ultimate merits of the case.

AFFIRMED AND REMANDED.