**UNITED STATES of America, Plaintiff,**

v.

**Paul A. HALL, Defendant.**

**Citation No. F1394169/EC44 GGH.**

United States District Court,
E.D. California.

Nov. 27, 1990.

Ross Huggins, Office of the U.S. Atty., Sacramento, Cal., for plaintiff.

Suzanne Luban, Office of the Federal Defender, Sacramento, Cal., for defendant.

ORDER

GREGORY G. HOLLOWS, United States Magistrate.

As the value of our National Forests becomes ever more evident with the passing years, the disputes regarding proper usage of those Forests becomes ever more frequent. This criminal case is one of those encounters between a holder of an unpatented mining claim, who believes that he is performing a valuable service in extracting precious metals, and the managing agency of the Tahoe National Forest, which increasingly views the miners as persons who are out to carve a piece of the public domain for themselves to the exclusion of all others. For the reasons expressed below, the miner will win this encounter as the court grants the Fed. Rules of Crim.Pro., Rule 29 motion made by the defense.[1]

*Facts*

On July 13, 1990, defendant Paul Hall was cited by an employee of the Tahoe National Forest (the "Forest") for a violation of 36 CFR § 261.10(b)—occupying National Forest lands for residential purposes

---

1. The government rested its case after two days of evidence. Because a Rule 29 motion made at the close of the prosecution's case cannot be taken under submission at that time with the defense required to go forward with its case, the court continued the trial while it considered the arguments made by the parties. The result here, of course, obviates any need for the defense to put on its case.

without authorization.[2] The history behind the citation goes back to 1977.

On or about November 26, 1977, Hall submitted a proposed operating plan for the purpose of mining the historical Twin Sisters Mine (also known as the Mountain Meadow claim). The operating plan was a barebones outline of the proposed activity at the mine. This operating plan was approved by the District Ranger with jurisdiction over that area of the Forest. At the time of the first approval, the District Ranger had prepared an "environmental analysis" concerning the operating plan. The plan was later amended and approved to authorize residential usage. It is undisputed in this case that the operating plan as amended "authorized" residence at the mine site as that term is found in the Forest Service regulations. The Forest knew that Hall and his wife were residing at the mine year round. The plan was amended and approved several more times during the early 1980's.

Sometime in 1987, other miners (Michelson) joined Hall in some type of combined venture at the Twin Sisters Mine. At least some of the other miners began to reside at Twin Sisters without an operating plan or other Forest authorization. After the Forest acquired knowledge of the Michelson miners, it also acquired knowledge that certain of Hall's other mining claims in the area had supposedly been sold in a Sheriff's sale. Although it may not have been clear to the Forest officials at the time, the evidence was clear at trial that the Sheriff's sales related to claims other than the one at issue here. Hall still retained an interest in the claim at issue and still resided there.

Sometime in the late Spring of 1990, Hall was told by a Forest employee that the rumored sale of his interests necessitated the filing of a new operating plan, or at least the supply of information to determine whether a new plan had to be filed. Apparently, although it is not clear, this request for a new plan was also made because of the number of miners on the site. In June of 1990, the Forest Resource Officer, Peggy Hernandez, visited the mine to tell Hall that he was not in compliance with § 261.10(b). She delivered a letter to this effect, but the letter was never introduced by the government, and the precise substance of the letter and its authorization is not known. The citation was issued a month later ostensibly because Hall had still refused to supply the new operating plan and additional information as requested.

The evidence is clear that the Forest took no formal process to cancel or otherwise revoke Hall's operating plan. It was the position of the government at trial that when a Forest employee told Hall that he was not in compliance,[3] the Forest considered his operating plan as void. The closest the Forest came to providing Hall a hearing for termination of his plan was an informal meeting just prior to the issuance of the citation. At this abortive meeting, the Forest alleges that it tried to impress upon Hall the importance of submitting the new information. Through cross-examination, Hall contended that the Forest had told him he could forget about ever getting a new plan approved.

Both the government and the defense (during cross examination) introduced a copious amount of evidence concerning the amount of work, or lack thereof, that Hall was performing on the mining claim. However, for reasons that will be made clear in the following analysis, this evidence was not relevant to the citation issued, and hence, not relevant to the out-

---

**2.** Violation of this regulation can result in a penalty as high as six months imprisonment and a $5,000.00 fine. *See,* 36 CFR 261.1b and 18 U.S.C. § 3571(b)(6).

**3.** It was never clear from the testimony what Hall was out of "compliance" with; the Forest had not cited Hall with an infraction of any Forest regulation other than residing on the Forest without authorization. The Forest had not cited Hall for being out of compliance with his operating plan. Hall had not complied with the request of the Forest employees to submit additional information or a new plan; however, the government could point to no regulation which would *ipso facto* void a previously valid plan for this refusal.

come.[4]

*Analysis*

### A. The Mining Laws and Forest Regulations

In 1872 Congress enacted a general mining law which encouraged persons to explore the public domain in order that valuable minerals and metals could be extracted. The provisions of this law are now codified at 30 U.S.C. §§ 21–54. These statutory provisions enabled a prospector to "claim" an area in which he had made a "valuable" discovery. The maximum size of a claim was approximately 20 acres. According to the 1872 Act, the locator of the claim enjoyed the "exclusive right of possession and enjoyment of all the surface included within the lines of their locations." 30 U.S.C. § 26.

This very substantial right to claim public land for mineral development led to abuses, and Congress decided to limit the rights a miner had to use the land to the exclusion of all others. The Multiple Use Act, 30 U.S.C. §§ 611–612, "shared" the surface resources of an unpatented claim with other uses (including recreation) so long as the shared use did not interfere with mining activities. The "freedom" of the miner was further curtailed throughout the 1960's and 1970's by further legislation, and the more vigorous assertion of authority by the Forest Service under the statutory provisions that set up the National Forests. *See,* 16 U.S.C. § 472 *et seq.* (National Forest "Organic Act" giving the Secretary of Agriculture the authority to prescribe regulations concerning use of the National Forests); 42 U.S.C. § 4321 *et seq.* (NEPA—setting up procedural safeguards for protecting the environment from the impact of projects on federal lands); 43 U.S.C. § 1701 *et seq.* (setting up an annual recording requirement for unpatented claims in order to ferret out abandoned claims). It is now clear that the miners "must take their mineral interests with the knowledge that the Government retains substantial regulatory power over those interests." *United States v. Locke,* 471 U.S. 84, 105, 105 S.Ct. 1785, 1798, 85 L.Ed.2d 64 (1985). Significantly, however, although the unfettered ability of the miner to use his claim had ceased with the latter enactments of Congress, 30 U.S.C. § 26 has never been repealed. The traditional rights of the miners exist today and must be harmonized with other uses. The Forest Service regulations recognize the need to harmonize the often competing concerns. *See,* 36 CFR § 228.1.

Thus, even today, the holder of an unpatented mining claim possesses an actual interest in the real property associated with the claim. The United States retains the fee title, however, the miner acquires a "fully recognized possessory interest." *United States v. Locke,* 471 U.S. at 86, 105 S.Ct. at 1788. A prior Supreme Court decision described the miner's property interest as a "unique form of property." *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 335, 83 S.Ct. 379, 382, 9 L.Ed.2d 350 (1963).

As recognized by the Forest Service regulations, the operating plan is at the heart of the creation of an authorized claim. 36 CFR §§ 228.4–228.7. Rare indeed will be the mining claim that does not require the submission of a plan.[5] It is fair to say in the vast majority of cases that the approval of the operating plan is the administrative action which vests the miner with the above described property interest. Once approved, however, a federal agency may not arbitrarily strike down an operating plan. *Best,* 371 U.S. at 337–338, 83 S.Ct. at 382–83. Furthermore, due process in a matter concerning a mining claim implies notice and a hearing at the agency level or in court. *Id.* at 337–338, 83 S.Ct. at 382–83.

Thus, it is with some astonishment that a review of the Forest Service regulations pertinent to mining reveals not a single

---

**4.** If Hall had been charged with a violation of § 261.10(k) (violating a term or condition of an approved operating plan), the evidence might have had some relevance depending upon the nature of the violation alleged.

**5.** Mere occupancy of a claim is a "significant disturbance" of the land requiring the submission of an operating plan. *United States v. Langley,* 587 F.Supp. 1258 (E.D.Cal.1984).

regulation dealing with the actual termination/cancellation of an approved operating plan along with the process which is due to revoke the vested property right. Section 228.7 describes the notice that shall be given to miners not in compliance with the regulations or an operating plan, but the section falls short of specifying what action may be taken if ultimate compliance is not secured, and who is empowered to levy any sanctions after notice and hearing. In addition, the regulation requires a finding of unreasonably causing damage to Forest resources, a fact not in evidence here.[6] The regulations allow for an appeal of a Forest decision, 36 CFR 228.14 incorporating the appeal procedures set at 36 CFR Part 251, Subpart C; however, an appeal after the fact is quite different from notice and a meaningful hearing before one is deprived of a property right.[7] The testimony at trial was point blank—there is no regulation providing for automatic termination of an operating plan—there is no written regulation describing how one terminates an operating plan. The government argument and testimony at trial further revealed that the Forest management filled this very obvious gap in the regulations by interpreting the regulations to give management an "implied" power of revocation, or put another way that "practical realities" dictated that Forest management have the power to revoke operating plans without hearing.

B. Because The Authorization To Reside At The Mine Was Revoked, If At All, Without Any Due Process, A Criminal Conviction For Residence Without Authorization Is Not Possible

 There was no legally effective notice of any sort to the defendant that his operating plan had been revoked at the time he received his citation. The evidence indicated that no "official" action had been taken at all with respect to the operating plan. Under this interpretation of the evidence, the Forest was simply wrong when it cited the defendant for not having residential authorization—the previously approved operating plan with residential authorization was still in effect.

Even if one interprets the Forest statement regarding noncompliance with the requests for more information and the abortive meeting between Forest personnel and the defendant as the "implied revocation" of the operating plan, the lack of due process for the revocation and the lack of proper notice that defendant was in violation of the law similarly renders a criminal prosecution here improper.

Firstly, since the operating plan was never properly revoked, the arbitrary revocation cannot stand as a grounds for the criminal violation. Before a property right, or even a government issued license, is *taken away* (as opposed to issued), the due process clause of the Fifth and Fourteenth Amendments (state action) demands that notice and *some* meaningful opportunity to be heard be given.

Once licenses are issued, as in the petitioner's case, their continued possession may become essential in the pursuit of a livelihood.... In such cases the licenses are not to be taken away without the procedural due process required by the Fourteenth Amendment. *Snidach v. Family Finance Corp.*, 395 U.S. 337 [89 S.Ct. 1820, 23 L.Ed.2d 349] (1969); *Goldberg v. Kelly*, 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970). This is but an application of the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a "right" or a "privilege".

6. The government neither introduced nor argued that any provision of the Forest Service Manual filled the due process void in this case, and the court assumes the government would have introduced any such references.

7. The significant difference between an appeal, even an appeal with rarely used stay provisions, and a pre-deprivation hearing is illustrated quite well by the facts of this case—the defendant was informed shortly before the time he received a criminal citation that he was residing on the Forest without authorization. This implied revocation of the operating plan effectively precluded Hall from residing at the mine or from further mining. This lack of due process is discussed at length below.

*Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971). *See also, Chalkboard Inc. v. Brandt,* 902 F.2d 1375 (9th Cir.1990).

Of course, the Fifth Amendment due process concern here carries an identical analysis. Due process does not take a holiday simply because the federal government is involved. The concerns expressed in *Bell* are especially heightened here in that the interest involved is a *bona fide* property interest, *Locke, supra; Best, supra,* that not only involves a person's livelihood but also his residence. Pre-hearing deprivations of important property interests with little, if any, due process are allowed only in situations where the compelling nature of the government's interests demands speedy action, and the regulatory action is subject to post-deprivation process. *Cassim v. Bowen,* 824 F.2d 791, 797 (9th Cir.1987). Given that Hall had resided on his claim for over a decade, and that no environmental concerns of a pressing nature were evidenced here, a deprivation without some type of *prior* meaningful due process hearing was invalid. Indeed, all of the factors that the *Chalkboard Inc.* court found relevant to the analysis of when pre-deprivation hearings are necessary weigh in favor of mandating such a hearing. The property interest here is important. The risk of an erroneous deprivation caused by unilateral government decision-making is high; that is, in a dispute seeking revocation of an operating plan because of non-compliance with regulations or the plan itself, there is likely to be a wide variety of evidence relevant to the issues, including evidence going to the credibility of witnesses. In a particular case where formerly approved mining activities are causing immediate irreparable damage, the United States Attorney's Office is merely a phone call away for the seeking of a temporary restraining order or preliminary injunction. Also, the Forest Service itself could devise regulations with a modicum of pre-deprivation due process to handle the routine and emergency situations administratively, if it so desired. *See, Chalkboard Inc.,* 902 F.2d at 1381.

While it is not the province of this court sitting in criminal jurisdiction to suggest what regulations concerning revocation of an operating plan could pass muster, the court notes that the Interior Department has been able to define the process that is due in similar circumstances. *See, e.g.,* 43 CFR § 4.451 *et seq.* (dealing with government contests to the validity of mining claims under the cognizance of the Interior Department); *see also,* 14 CFR § 13.13–13.235 (administrative adjudicatory procedures utilized by the Federal Aviation Administration, including those for emergency suspensions of licenses/certificates).

Lest there be any mistake as to the scope of the decision here, this case has nothing to do with the validity of the Forest Service appeal procedures as they relate to initial decisions to grant permits or approve operating plans. The procedures set forth in 36 CFR § 251.80 *et seq.* may well be constitutionally acceptable for such purposes. Neither does this opinion touch upon the necessity for an approved operating plan, *see, United States v. Brunskill,* 792 F.2d 938 (9th Cir.1986), nor the necessity for appealing conditions/terms required by the Forest Service for an approved operating plan with which the aggrieved miner disagrees, and, if not complied with, may subject the miner to criminal liability under 36 CFR 261.10(k), *see, United States v. Doremus,* 888 F.2d 630 (9th Cir.1989). The narrow issue here is whether a pre-deprivation hearing is required before a revocation decision is issued on an already approved operating plan—revocation of a vested property interest. *Chalkboard Inc.* indicates that such a hearing is necessary. The after the fact appeal procedures set forth in 36 CFR § 251.80 *et seq.,* even considering the provisions for a possible stay, do not provide a pre-deprivation hearing. The present regulations are constitutionally infirm as applied to the Hall situation.

■ Even assuming, only for the moment, the validity of the "implied revocation" of the operating permit, due process of another sort was violated by the citation. A person is generally entitled to fair notice

that he is in violation of the law before criminal penalties can attach. *Lambert v. People of the State of California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1958). This is especially so where the violation depends upon an independently determined legal status. *Id.* Such is the case here. The government depends upon an independently determined status, i.e., revocation of an operating plan, hence making one without authorization to reside in the Forest, as the basis of its prosecution. Yet the evidence reveals that notice of this revocation was never effectively made to Hall;[8] there is certainly no regulation or other law which would impute knowledge of the "implied revocation" to Hall. A prosecution based upon such lack of notice cannot stand. *See also, United States v. Vasarajs*, 908 F.2d 443 (9th Cir.1990) stating that there has to be *some* notice to a defendant concerning the facts of a criminal violation to satisfy due process.[9]

Everyday analogous examples demonstrate the impossibility of the government's case. Suppose one has a validly issued building permit but, during the course of construction, the county building inspector, having asked the permittee for information without success, declares that certain aspects of the construction are not in compliance with code provisions. The inspector, without any process to terminate the permit, then causes a criminal citation for building *without a permit* to be issued. Obviously, the permit itself is still valid. Or consider the driver who does not furnish information to an officer of the Highway Patrol, is told that he is not in compliance with California law, and then is issued a misdemeanor citation for driving without a license. While in both cases the actions of the cited person might warrant further administrative or civil action to revoke the permit or license, the non-compliance with an official request by itself does not stand as the revocation—at least without that

fact being clearly spelled out in the law. *Compare United States v. Locke, supra* (where a statute itself provided for automatic abandonment of a mining claim if statutory filing deadlines were not met).

Since the absence of a valid authorization for residency purposes is the heart of the Government's burden in this criminal action, no reasonable trier of fact could find for the government based on the evidence presented in its case-in-chief. The defendant is acquitted of the charge against him.

---

**8.** Hall was simply told by a Forest employee that he was not in compliance with the regulation at issue here—that he not reside on the Forest without authorization. He was never told that his approved operating plan (including approved residency) had been revoked.

**9.** In this case the Ninth Circuit found that the defendant did have sufficient notice of the boundaries of a military base to warrant a prosecution for re-entry onto the military base after having been barred from the base.