PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1833
_____

B.S., and B.S. as guardian and parent of
T.S., G.S., and N.S.,
                              Appellants

v.

SOMERSET COUNTY; SOMERSET COUNTY
CHILDREN AND YOUTH SERVICES;
JESSICA ELLER; JULIE BARTH
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 3-08-cv-00030)
District Judge:  Hon. Kim R. Gibson

Argued
January 10, 2012

BEFORE:  FUENTES, JORDAN, and NYGAARD, *Circuit Judges*.

(Filed: January 8, 2013 )

_____

Edward A. Olds, Esq. [ARGUED]
1007 Mount Royal Boulevard
Pittsburgh, PA  15223
        *Counsel for Appellant*

Marie M. Jones, Esq. [ARGUED]
Jones Passodelis
707 Grant Street
Suite 3510, Gulf Tower
Pittsburgh, PA  15219
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*

Appellant B.S. ("Mother") is the natural mother of M.N. ("Daughter"), a minor child.  Mother had primary legal custody of Daughter until Daughter was removed from Mother's care in accordance with a court order that transferred custody to the child's natural father, E.N. ("Father").  Mother claims that Somerset County (the "County"), along with Somerset County Children and Youth

Services and two of its employees, Julie Barth and Jessica Eller, (collectively, "Appellees") violated her constitutional rights to substantive and procedural due process in securing and effectuating the transfer and related orders. She seeks to redress those alleged constitutional violations under 42 U.S.C. § 1983, and she is now appealing an order of the United States District Court for the Western District of Pennsylvania that rejected her claims and entered summary judgment in Appellees' favor.

We agree with Mother that her procedural due process rights were violated by the Appellees, though the individual defendants are protected by absolute immunity. As to the substantive due process claims, we conclude that the District Court's grant of summary judgment for the Appellees was correct, though for somewhat different reasons than those expressed by that Court. We will therefore affirm in part and reverse in part the District Court's order and will remand the case for a trial against the County on the damages Mother sustained when her procedural due process rights were violated.

## I.  Background[1]

Daughter was born in June 2004 and suffered a variety of medical problems that stunted her growth. In October 2005, Mother took Daughter to a pediatric gastroenterologist

---

[1] Although our standard of review directs us to view the facts in the light most favorable to the party against whom summary judgment is sought, *see infra* Part II, we proceed at this point by reciting the undisputed facts.

named Dr. Douglas Lindblad, who diagnosed Daughter with failure to thrive.[2] After running various tests to determine the cause of her condition, Dr. Lindblad referred Daughter for inpatient treatment at the Children's Institute of Pittsburgh (the "Children's Institute").

She was treated there from March 20, 2006 to March 26, 2006, and gained 50 grams per day during that time. That weight gain was normal for a child of Daughter's age in Daughter's condition, reflecting what "[she] would have been expected to gain plus additional weight which would get … [her] to the point … where [she] should [have] be[en] in terms of growth." (Joint App. at 668; *see id.* at 669.) Daughter had not experienced normal growth before that time, having previously gained only 8 to 11 grams per day. Sadly, after concluding her inpatient treatment and returning to Mother's care, Daughter gained only 4 grams per day, at least initially.

### A. *Dr. Lindblad's Child Abuse Report*

The "fact that [Daughter's] weight gain when she was an inpatient … far exceeded her rate of weight gain at home" concerned Dr. Lindblad (*id.* at 139), and led him to attribute Daughter's failure to thrive to how Mother was caring for her.

---

[2] Failure to thrive is a diagnosis that may be "based upon an objective finding that a child's weight falls below the third percentile of weight of children of like age." (Appellant's Opening Br. at 15; *see* MedlinePlus Medical Encyclopedia, *Failure to Thrive*, http://www.nlm.nih.gov/medlineplus/ency/article/000991.htm (last visited Nov. 6, 2012).)

4

Specifically, after examining Daughter on April 18, 2006, Dr. Lindblad concluded that Daughter's failure to thrive was psychosocial, as opposed to physical, in origin. Psychosocial failure to thrive occurs when a "child's failure to thrive is due to some factors in the home that lead the child not to grow well," and is "usually associated with inadequate caloric intake." (*Id.* at 670.) Although psychosocial failure to thrive is not necessarily associated with neglect, Dr. Lindblad feared that Daughter was being neglected by Mother, and he further opined in his progress notes that he was "concerned about Munchausen by proxy."[3] (*Id.* at 433.)

As a result, Dr. Lindblad believed Daughter was in physical danger that justified reporting to state authorities his fear that Mother was neglecting Daughter, or worse. But while Dr. Lindblad believed that action was warranted after seeing Daughter on April 18, 2006, he did not immediately make a report to "ChildLine," the Pennsylvania state entity responsible for receiving reports of neglect and abuse.[4]

---

[3] Munchausen by proxy "is a form of child abuse in which a parent induces real or apparent symptoms of a disease in a child." MedlinePlus Medical Encyclopedia, *Munchausen Syndrome by Proxy*, http://www.nlm.nih.gov/medlineplus/ency/article/001555.htm (last visited Nov. 6, 2012).

[4] As detailed in Part I.C, *infra*, Pennsylvania provides a specific protocol for reporting and investigating child abuse. Under that statutory and regulatory framework, certain persons are required to report suspected abuse. *See* 23 Pa. Cons. Stat. Ann. § 6313(a) ("Reports from persons required to report … shall be made immediately by telephone and in writing within 48 hours after the oral report."). ChildLine is

5

Instead, his first contact with state authorities about Daughter's case occurred on May 4, 2006, when he spoke with Jessica Eller. Eller, a child welfare caseworker for Somerset County Children and Youth Services,[5] was already

the state entity that accepts such calls. *See* Pennsylvania Department of Public Welfare, *Child Line Abuse Registry*, http://www.dpw.state.pa.us/provider/childwelfareservices /childlineandabuseregistry/index.htm (last visited Nov. 6, 2012) ("The Mission of ChildLine is to accept calls … 24 hours per day, seven days per week. … The Intake Unit … is available … to receive reports of suspected child abuse.").

[5] Appellees acknowledge that Somerset County Children and Youth Services acts on behalf of Somerset County with respect to child protective services (*see* Joint App. at 77 (stating that Somerset County Children and Youth Services "perform[s] certain functions as permitted under state law regarding the protection of children in Somerset County")), and have treated the liability of those two entities as being coextensive throughout the litigation in this case. *See, e.g.*, W.D. Pa. ECF no. 08-30, doc. no. 50, at 2; 12-15 (arguing that judgment should be entered "as to [Mother's] claims against Somerset County and Somerset County CYS because there is no evidence of record of any unconstitutional custom, policy or practice," and focusing exclusively on Somerset Children and Youth Services' conduct in developing that contention). We thus treat them as the same for purposes of our discussion and will generally refer to Somerset County and Somerset County Children and Youth Services collectively as "the County" throughout this opinion.

6

investigating Daughter's case and had previously contacted Dr. Lindblad in connection with her investigation.[6]

Dr. Lindblad told Eller of the discrepancy between Daughter's inpatient weight gain and her weight gain when under Mother's care, explained his conclusion that Daughter's failure to thrive was psychosocial in origin, and described his concern about Munchausen by proxy. During that conversation, Eller "instructed Dr. Lindblad to [file] a ChildLine report" (*id.* at 311), which he did shortly thereafter.

B.    *Eller's Child Abuse Report*

At some point, Eller also made her own ChildLine report.[7]  A description of Eller's ChildLine report stated that

---

[6] Given the path this case has followed, there is some irony in how it began. The County was initially contacted by Mother, who reported in December 2005 that she believed Father was not properly feeding Daughter when Daughter stayed at Father's home. Eller was assigned to the case, and met with Father in relation to her investigation. During that meeting, Father described the difference between Daughter's inpatient weight gain and her weight gain at home, which evidently prompted Eller to investigate whether Mother was being neglectful or abusive.

[7] The parties dispute whose report came first. Mother implies that Eller's ChildLine call was made on May 4, 2006 while Dr. Lindblad waited until May 5, 2006 to make his ChildLine call. Appellees, by contrast, state that Dr. Lindblad made his ChildLine report on the evening of May 4, 2006 whereas Eller's call was made on May 5, 2006. The difference is immaterial to our decision.

she had opted to make the report after speaking with a referral source and consulting her supervisor, Julie Barth, and the report relayed much of the information Dr. Lindblad had told Eller.[8] After making her initial ChildLine report, Eller prepared a summary of her findings in Daughter's case to present to a judge for the purpose of removing Daughter from Mother's home. Her summary, dated May 5, 2006, stated:

> [The County] received a referral on May 5, 2006 alleging serious physical neglect of [Daughter] by … [Mother] … . Childline [sic] contacted [the County] and an investigation has been initiated. Allegations of the neglect are psycho-social failure to thrive. [Daughter] is nearly 2 years old and is currently 19 pounds. She was gaining 8-10 grams of weight per day while being fed by her mother, until she entered the Children's Institute due to concerns of low weight on March 20, 2006. While at the Children's Institute, [Daughter] gained 50 grams of weight per day while still being fed by her mother under the supervision of the Institute staff. Since her discharge on March 26, 2006 [Daughter] is now gaining 4-5 grams of weight per day.
>
> [The County] believes that it would be contrary to the welfare of the child … to continue to reside with and have unsupervised

---

[8] The written summary of the ChildLine report did not, however, describe Dr. Lindblad's Munchausen by proxy concern or attribute the reported information to Dr. Lindblad.

8

> contact with … [Mother] until the outcome of the investigation is determined. Therefore, the Agency is requesting that all visitation and contact between [Mother] and [Daughter] [be] supervised by the Agency pending the outcome of the investigation.

(Joint App. at 467.) Eller also prepared a corresponding court order to suspend Mother's contact with Daughter and transfer the child to Father's custody.[9]

According to Appellees, the information relayed in Eller's summary "was based upon [a] good faith recall and reading of" Daughter's medical records. (*Id.* at 380.) However, the summary's reference to Daughter's weight being 19 pounds was mistaken, in light of her most recent weigh-ins.[10] Whether Eller was aware of any error in the summary is a matter of dispute, but, in any event, she took her prepared summary and court order to Judge Cascio of the Court of Common Pleas of Somerset County, and presented them to him *ex parte* on May 5, 2006. Judge Cascio reviewed Eller's summary, and signed the proposed order, which provided as follows:

---

[9] Notwithstanding the prior allegations that Mother lodged against Father, *see supra* note 6, Mother does not now contest that he was fit to be a custodial parent.

[10] When Dr. Lindblad examined Daughter on April 18, 2006, he recorded her weight as 9.2 kilograms, which is equivalent to 20.2 pounds. In late April, Daughter was weighed by two other physicians, and her weight was recorded as being between 20 pounds and 21 pounds.

> [D]ue to allegations of serious physical neglect which are under investigation by [the County], it is hereby ordered that all contact and visitation between … [Daughter] and … [Mother] … be supervised by [the County] pending the outcome of the investigation. It is also ordered that [Daughter] shall reside with … [Father] … until the completion of the investigation and [Mother] shall conduct herself appropriately in all visitations with [Daughter], including no badgering or harassing the agency staff, belittleling [sic] any service providers or … [Father].

(*Id.* at 468.) Judge Cascio's order and Eller's summary were each filed under case number 20-B Juvenile 2006.

### C.    *Daughter's Removal from Mother's Home*

Armed with Judge Cascio's order, Eller, along with a police officer, went to Mother's home that same day and took Daughter from Mother. Pennsylvania's Child Protective Services Law (the "CPSL") ordinarily requires that a follow-up hearing be held within 72 hours of a child's removal from a parent's custody.[11] According to Appellees, however, they

---

[11] Aimed at "encourag[ing] more complete reporting of suspected child abuse" and at protecting children from further abuse, 23 Pa. Cons. Stat. Ann. § 6302(b), the CPSL requires child abuse reports to be investigated and permits children to be taken into protective custody by the state, *see id.* § 6315. The statute provides, however, that any protective custody may not "be maintained longer than 72 hours without an

10

were not required to schedule such a hearing because, although Daughter was removed from Mother, she was transferred to Father's custody and not to the state's custody. Indeed, as Eller explained it, although a post-removal hearing would normally be required within 72 hours after executing an order taking a child into the state's custody, no hearing is required to comply with state law if the County merely "transfers custody" to another parent, because the County would not have "take[n] custody." (Joint App. at 292.)

That view was also expressed by Natalie Hunt, the Assistant Director of Somerset County Children and Youth Services. Explaining that the kind of transfer in custody that occurred in this case is employed when there is a fit parent who can take custody of the child, Hunt testified that "the 72-hour-hearing requirement is [not] necessary" unless the County files a dependency petition to take custody of a minor. (*Id.* at 331.) Caseworker supervisor, Douglas Walters, echoed Hunt's testimony, stating that, for as long as he could remember, the County would simply contact a judge when it felt it "needed to get an order, obtain an order to stop contact until [the County] could investigate" (*id.* at 339-40), and that, in such circumstances, the "agency doesn't schedule a hearing" (*id.* at 342).[12] He said that, on average, the County

---

informal [court] hearing" as provided in the Juvenile Act. *Id.* § 6315(d). Pennsylvania's Juvenile Act requires an "informal hearing [to] be held promptly by the court or master and not later than 72 hours after the child is placed in detention or shelter care to determine whether his detention or shelter care is required." 42 Pa. Cons. Stat. Ann. § 6332(a).

[12] In light of the CPSL's requirements for follow-up hearings in cases in which protective custody is taken, we

---

11

asks a judge to restrict contact between a parent and a child in that manner five to ten times per year.

Thus, because Appellees thought it unnecessary to hold the hearing that Pennsylvania law would require were Daughter taken into state custody, no follow-up hearing was scheduled and Mother received no explanation of how to arrange for a hearing. Instead, Eller simply presented Mother with Judge Cascio's order and left with Daughter.

### D. *Daughter's Subsequent Weigh-Ins and Eller's Investigation*

Immediately after picking Daughter up on May 5th, Eller took her to a pediatrician at what the parties refer to as "Berlin Pediatrics."[13] During that visit, Daughter's weight was recorded as being 22 pounds, 2 ounces. Daughter returned to Berlin Pediatrics with Father three days later, on May 8, 2006, and her weight was again recorded as 22 pounds, 2 ounces. The results of those two weigh-ins are

---

understand Walters to have been referring to orders stopping contact between the parent and the child in which the state does not take custody of the child.

[13] Although the record is not entirely clear, we understand the references to "Berlin Pediatrics" to be a shorthand for the Somerset Pediatric and Adolescent Health Center in Berlin, Pennsylvania. (*See* Joint App. at 710 (Daughter's "Berlin Pediatrics" growth chart with a stamp for the "Somerset Pediatric and Adolescent Health Center" in Berlin, Pennsylvania).) We will employ that shorthand throughout this opinion.

highly significant because, as Dr. Lindblad explained during his deposition, they placed Daughter around the fifth percentile on the growth chart and would "not support a diagnosis of failure to thrive," if the trend in growth they showed were to continue.[14] (*Id.* at 366-67.) It did not. When Daughter was weighed at Berlin Pediatrics on May 16, 2006, she was 20 pounds, 11 ounces.

Eller, in the meantime, continued investigating Mother. The result of her investigation was a June 19, 2006 Child Protective Services Investigation report that found the allegations of neglect against Mother to be supported by substantial evidence.[15] Eller's conclusion was based on her

---

[14] Based on the results of those weigh-ins, a physician retained by Mother opined that Daughter should not have been removed from Mother on May 5, 2006. (*See* Joint App. at 695 ("It is unclear to me why the child was removed on a day when she showed significant weight gain for the first time while under the mother's care.").) Dr. Lindblad offered similar testimony, stating he would likely not have called ChildLine if he was aware of Daughter's May 5, 2006 weight. (*See id.* at 369 (Dr. Lindblad's testimony that he likely "would have waited until another opportunity to examine the child for weight before calling the ChildLine," if he had been aware of the May 5 weight of "22 pounds, 2 ounces").) As discussed in greater detail herein, the importance of Daughter's May 5 and May 8 weights is contested because Appellees take the position that Daughter was, unlike on other occasions, wearing clothes when weighed. *See infra* note 34.

[15] Under Pennsylvania state law, Eller was required to send "one copy of" that report form, known as "CY-48," to

13

finding that Daughter had gained only 4 to 5 grams of weight per day while under Mother's care following her discharge from inpatient treatment, compared to the 50 grams per day she gained while at the Children's Institute and to the average of 40.5 grams per day she gained from May 16, 2006 to May 30, 2006, while under Father's care.

Those findings were misleading, however, because they implied that Daughter's first weigh-in under Father's care occurred on May 16, 2006 and that Daughter weighed only 19 pounds, 10 ounces when she was initially placed in Father's care on May 5, 2006.[16] Eller's report did not mention Daughter's May 5 and May 8, 2006 weigh-ins at Berlin Pediatrics, because Eller treated them as invalid measurements. She asserted that those weights are unreliable

---

ChildLine "within 30 days of the receipt of an oral report of suspected abuse." (Joint App. at 455; *see* 55 Pa. Code § 3490.67(a) ("The county agency shall send the Child Protective Service Investigation Report form (CY-48) to ChildLine within 30-calendar days of the receipt of the report of suspected child abuse.").)

[16] Specifically, Eller's report stated that "[s]ince [Daughter's] first weigh-in on May 16, 2006 [Daughter] has gained 481 grams of weight or on average of [sic] 18 grams of weight per day." (Joint App. at 456.) Daughter's May 16, 2006 weight of 20 pounds, 11 ounces is equivalent to 331 ounces or 9383.692 grams. Thus, Eller's assertion that Daughter had gained 481 grams implied that she had initially weighed in at 8902.692 grams, which is equivalent to 19 pounds, 10.03 ounces.

14

because Daughter had been dressed when they were taken.[17] By ignoring those data points, Eller was not forced to consider that Daughter may have gained significant weight while under Mother's care before Daughter was removed on May 5, 2006, and that Daughter's weight seemed to drop when she was first placed with Father.

E.      *Mother's Habeas Corpus Petition, and Judge Cascio's Orders in Connection With Eller's Report*

Before Eller's June 19, 2006 Child Protective Services Investigation report was submitted to the state, Mother filed a habeas corpus petition in the Court of Common Pleas of Somerset County, arguing that the County had violated state law by not providing a hearing after removing Daughter from Mother's custody. Mother's petition was filed under the same case number as the May 5, 2006 order removing Daughter from Mother's custody, and a hearing was held before Judge Cascio on June 14, 2006. At the hearing, which occurred 40 days after Daughter was removed from Mother's custody, the County contested Mother's petition by arguing

---

[17] Eller wrote "dress" next to the May 5 and May 8 results on a copy of a growth chart prepared by Berlin Pediatrics. She stated in her deposition that she observed that Daughter's clothes were not removed when Daughter was weighed on May 5, and that Father informed her that Daughter was dressed for the weigh-in that occurred on May 8. Daughter's pediatrician stated in his deposition, however, that the "standard practice" at Berlin Pediatrics was to weigh children such as Daughter "without their clothes." (Joint App. at 371.)

that it had no obligation to conduct a post-removal hearing because it had not taken custody of Daughter. The hearing concluded with Judge Cascio's taking Mother's petition under advisement.

Eller, as noted, completed and filed her Child Protective Services Investigation report five days later, on June 19, 2006.[18] Four days after that, on June 23, 2006, she met *ex parte* with Judge Cascio to present another summary to him that relayed her findings. It stated:

> [The County] has completed the Child Protective Services investigation regarding serious physical neglect of [Daughter]. The [report] was filed on June 19, 2006 with Childline and substantiated [Mother] … as the perpetrator. Due to the indicated status of the report [the County] is recommending that visits continue to be supervised between [Mother] and [Daughter] until further hearings on this matter are scheduled by either parent.

(*Id.* at 712.) As she had done before, Eller offered a proposed order to Judge Cascio, along with her summary. After that

---

[18] Mother was ultimately advised by letter of the conclusion reached in Eller's June 19, 2006 report. The letter advised that Mother had the right to request that the report be amended or destroyed if she believed it was inaccurate. She initiated proceedings to do that, but her request to expunge the report was denied. Although Mother had the opportunity to appeal that decision and she initially sought to do so, she ultimately withdrew her appeal.

16

meeting, the Judge entered the following order which, with Eller's summary, was filed on June 23, 2006 under the same case number as Mother's habeas petition and the initial removal order had been:

> [D]ue to the indicated report of serious physical neglect whereby [Mother] is the perpetrator, it is hereby ordered that all visitation between [Mother] and [Daughter] continue to be supervised until further hearings on this matter are scheduled by either parent.

(*Id.* at 713.)

A few days later, on June 26, 2006, Judge Cascio entered an order denying Mother's habeas corpus petition saying, among other things, that "[t]he child was not taken into protective custody so as to trigger the provisions and protections of the" CPSL; and that "[p]lacement of the child with her Father is necessary and appropriate considering the serious and continuing medical evidence of failure of the child to thrive while in Mother's care." (*Id.* at 714-15.)

Mother and Father subsequently embarked upon contentious custody proceedings, eventually receiving shared custody of Daughter.

F. *Procedural History*

On February 5, 2008, Mother initiated this lawsuit. She later filed an amended complaint asserting claims against Appellees for violating her substantive due process rights, as well as claims for violating her right to procedural due

process by transferring Daughter to Father's custody without timely notice or an opportunity to be heard.[19]  After the completion of discovery, Appellees filed a motion for summary judgment.  Mother opposed that motion and moved for summary judgment on her procedural due process claim.  Holding that the individual defendants were shielded by absolute or qualified immunity and that the County's actions did not violate Mother's constitutional rights, the District Court granted Appellees' motion and denied Mother's.  It entered judgment in Appellees' favor the same day.

This timely appeal followed.

## II.  Jurisdiction and Standard of Review

Because Mother challenges the process she received with respect to state court orders issued by Judge Cascio, we asked the parties to prepare letter-briefs on whether the *Rooker-Feldman* doctrine affects our subject matter jurisdiction in this case.  *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005) (explaining that "federal courts of first instance" lack jurisdiction to "review and reverse unfavorable state-court judgments" (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983))).  Appellees responded by arguing that the *Rooker-Feldman* doctrine bars Mother's constitutional claims.  Mother, of course, argues that the doctrine "has absolutely no application" to any of her claims.  (Appellant's Letter Mem. at 1.)

---

[19] Mother's complaint also pleaded a First Amendment claim and a civil conspiracy claim, which she has abandoned on appeal.

18

In *Great Western Mining & Mineral Company v. Fox Rothschild LLP*, 615 F.3d 159 (3d. Cir. 2010), we surveyed recent caselaw and concluded that "there are four requirements that must be met for the *Rooker-Feldman* doctrine to apply," *id.* at 166, namely that "(1) the federal plaintiff lost in state court; (2) the plaintiff complain[s] of injuries caused by [the] state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments," *id.* (alterations in original) (citation and internal quotation marks omitted). We concluded that a federal claim alleging that the defendants conspired to engineer the plaintiff's loss in state court proceedings was not barred by *Rooker-Feldman* because it did not "assert injury caused by state-court judgments and seek review and rejection of those judgments[.]" *Id.* at 171. Because the injury Mother claims is likewise traceable to Appellees' actions, as opposed to the state court orders those actions allegedly caused, we reject Appellees' contention that the *Rooker-Feldman* doctrine precludes federal subject matter jurisdiction in this case. *Cf. id.* at 166-67 (a father's suit "for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent" is barred by *Rooker-Feldman* (quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 87 (2d Cir. 2005))).

Having rejected Appellees' invocation of the *Rooker-Feldman* doctrine, it is clear that the District Court had jurisdiction under 28 U.S.C. § 1331. We, in turn, have jurisdiction under 28 U.S.C. § 1291, and exercise "plenary review of [the] district court's grant of summary judgment." *Funk v. CIGNA Grp. Life Ins.*, 648 F.3d 182, 190 (3d Cir. 2011). Accordingly, we view the facts in Mother's favor to

determine whether the District Court correctly held that "there [was] no genuine dispute as to any material fact and [that Appellees were] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because Mother challenges the District Court's decision to deny her summary judgment on her procedural due process claim, we must also view the facts in the light most favorable to Appellees to determine whether the District Court correctly determined that Mother was not entitled to summary judgment on that claim.

## III. Discussion

The Fourteenth Amendment's Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV. "As [the] concept [of due process] has developed, it has come to have both substantive and procedural components." *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 658 (3d Cir. 2011). Mother contends that Appellees violated both components when they removed Daughter from her home and transferred the child to Father's custody, and she thus seeks redress pursuant to 42 U.S.C. § 1983.[20] According to Mother, the District Court erred by entering judgment in Appellees' favor on the substantive due process claim, and by failing to

---

[20] Section 1983 permits a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States] … ." 42 U.S.C. § 1983.

20

enter a judgment recognizing that Appellees violated her procedural due process rights. She asks, therefore, that we vacate the District Court's order and remand the case for entry of judgment on her procedural due process claim, and for a trial on her substantive due process claim and on the damages attendant to her procedural due process claim.

Appellees respond that the District Court appropriately entered judgment in their favor because their actions did not violate Mother's due process rights. They further contend that, in any event, Eller and Barth cannot be liable because they are entitled to absolute or qualified immunity for all claims against them. In addition, although Appellees have not pressed the issue in their briefing before us, they argued to the District Court that the County cannot be liable because it is a municipal entity and not culpable for the acts of its agents, and, if true, that would be a basis for affirming the District Court's judgment as to the claims against the County.[21] *Cf. Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282 (3d Cir. 2012) ("[W]e can affirm based on any grounds

[21] As discussed at greater length herein, liability under § 1983 "attaches to a municipality only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (citation omitted); *see Good v. Dauphin Cnty. Social Servs. For Children & Youth*, 891 F.2d 1087, 1096 (3d Cir. 1989) ("The defendants … now argue that summary judgment should be affirmed on the ground that plaintiffs failed to state a cause of action against them under section 1983, because municipal liability cannot be based upon *respondeat superior* … .").

21

supported by the record.").  We consider first whether Eller and Barth are liable to Mother for any procedural or substantive due process violations, and then we address the County's liability for those claims.

### A.     *Due Process Claims Against Eller and Barth*

#### 1.     *Absolute Immunity in the Child Welfare Context*[22]

Although the Supreme Court has made clear that "[m]ost public officials are entitled only to qualified immunity," it has recognized that "public officials who perform 'special functions,'" such as prosecutors, are sometimes entitled to absolute immunity. *Yarris v. Cnty. of Del.*, 465 F.3d 129, 135 (3d Cir. 2006) (quoting *Butz v. Economou*, 438 U.S. 478, 508 (1978)).  The purpose of according absolute immunity to such officials is to ensure that they "can perform their respective functions without

_____

[22] Unlike a qualified immunity analysis, which often involves an initial inquiry into whether the facts alleged show a violation of a constitutional right, *see Pearson v. Callahan*, 555 U.S. 223, 232-36 (2009) (concluding that it is often appropriate, although not mandatory, for a court to first consider whether the facts alleged show a violation of a constitutional right before reaching the qualified immunity issue), the question of absolute immunity can be addressed as a threshold issue.  *See Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985) (concluding first that the Attorney General was not entitled to absolute immunity for his conduct before turning to the question of whether a constitutional right had been violated).

harassment or intimidation." *Butz*, 438 U.S. at 512. Although conferring absolute immunity obliges courts to sometimes deny relief to those "with valid claims against dishonest or malicious government officials," *Snell v. Tunnell*, 920 F.2d 673, 687 (10th Cir. 1990), the underlying logic is that it is ultimately "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation," *Yarris*, 465 F.3d at 135 (citation and internal quotation marks omitted).

Still, absolute immunity is "strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great." *Forrester v. White*, 484 U.S. 219, 230 (1988) (alterations in original) (citation and internal quotation marks omitted). Moreover, officials who "seek exemption from personal liability" on that basis bear "the burden of showing that such an exemption is justified by overriding considerations of public policy." *Id.* at 224. Thus, "[i]n light of the Supreme Court's 'quite sparing' recognition of absolute immunity …, we begin with [a] presumption that qualified rather than absolute immunity is appropriate," unless the official invoking absolute immunity meets a "heavy burden of establishing entitlement" to it. *Odd v. Malone*, 538 F.3d 202, 207-08 (3d Cir. 2008) (citation omitted).

Appellees contend that they have met that burden here because Eller and Barth performed "actions … closely analogous to those of prosecutors." (Appellees' Br. at 39.) As Appellees correctly point out, we have recognized that the justifications for according absolute immunity to prosecutors sometimes apply to child welfare employees. Specifically, in

*Ernst v. Child & Youth Services of Chester County*, 108 F.3d 486 (3d Cir. 1997), we joined several of our sister circuits in deeming "child welfare workers and attorneys who prosecute dependency proceedings on behalf of the state … absolute[ly] immun[e] from suit for all of their actions in preparing for and prosecuting such dependency proceedings." *Id.* at 488-89. The plaintiff in that case was the grandmother of a minor child for whom she was the sole legal guardian. *Id.* at 489. After receiving a report that the child had an extreme and unhealthy attachment to the grandmother, an employee of a state child welfare agency initiated emergency dependency proceedings to remove the child from the grandmother's custody and commit her to the custody of the state. *Id.* An immediate detention hearing was held, at which a state judge ordered that the child be placed in a psychiatric institution for a complete evaluation. *Id.* The state child welfare agency assumed custody of the child, and a legal battle between the agency and the plaintiff ensued. *Id.*

The plaintiff eventually filed suit under § 1983 alleging, *inter alia*, due process claims against various agency caseworkers and a private attorney who had represented the agency throughout the dependency proceedings. On appeal, we considered whether those defendants were "entitled to absolute immunity for their actions in petitioning and in formulating and making recommendations to the state court." *Id.* at 493. We began our analysis by noting that § 1983 "did not abolish long-standing common law immunities from civil suits," *id.*, including those against individuals who hold offices that did not exist at common law but who perform tasks "analogous to functions performed by those who were immune at common law," *id.* at 494. Drawing on the Supreme Court's extension of absolute immunity to

24

prosecutors, we held that absolute immunity cloaked state child welfare caseworkers from liability with respect to "their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings." *Id.* at 495. We clarified that such immunity was broad enough "to include the formulation and presentation of recommendations to the court in the course of such proceedings" *id.*, but we also said that "we would be unwilling to accord absolute immunity to 'investigative or administrative' actions taken … outside the context of a judicial proceeding," *id.* at 497 n.7.

Our holding, as we explained it, was premised on three parallels between child welfare employees and prosecutors:

> (1) the functions performed by [state child welfare caseworkers] in dependency proceedings are closely analogous to the functions performed by prosecutors in criminal proceedings; (2) the public policy considerations that countenance immunity for prosecutors are applicable to child welfare workers performing these functions; and (3) dependency proceedings incorporate important safeguards that protect citizens from unconstitutional actions by child welfare workers.

*Id.* at 495. As to the first point, we observed that, like prosecutors, "social worker[s] must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children." *Id.* at 496 (quoting *Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.*,

25

812 F.2d 1154, 1157 (9th Cir. 1987) (internal quotation marks omitted)). Regarding the applicable public policy considerations, we noted that, much like prosecutors, child welfare workers "acting in a quasi-prosecutorial capacity in dependency proceedings" are forced to "exercise independent judgment" that should not be compromised by exposing them to the potentially chilling effect of § 1983 liability. *Id.* at 496. Finally, we gave two reasons why § 1983 liability was not the only mechanism available to protect the public against unconstitutional conduct:

> First, the judicial process itself provides significant protection. Child welfare workers must seek an adjudication of dependency from a neutral judge whose decisions are guided by the "best interests of the child" and subject to appellate review. Second, although child welfare workers are not subject to the comprehensive system of professional responsibility applicable to prosecutors, they are under the supervision of the agency that employs them. The agency has an incentive to ensure that its employees do not violate constitutional rights because it is not immune from suit for abuses committed by employees with policy-making authority or acting pursuant to agency policy or custom.

*Id.* at 497 (citation omitted). Because the plaintiff's claims against the state child welfare workers arose "in connection with the formulation and presentation of recommendations to the state court regarding [the child's] dependency status and

26

disposition," we deemed those workers entitled to absolute immunity. *Id.*

We likewise extended that immunity to the private attorney who had represented the agency, because the attorney had – like the agency's employees – taken action "on behalf of the State that [was] integrally related to the judicial process." *Id.* at 502; *see also id.* at 504. Notably, we did so even though the attorney's allegedly unlawful actions occurred after the attorney had been ordered removed from serving on the agency's behalf and had been undertaken with a subjectively malicious intent. *Id.* at 503; *see also id.* ("It is true that Ernst alleged, and the court found, that [the attorney] … filed this petition because of hostility to Ernst rather than for the purpose of serving the best interest of [the child]."). Reasoning that the immunity analysis was to be undertaken "without reference to the official's subjective state of mind," *id.* at 502, we concluded that absolute immunity could protect the attorney from liability flowing from prosecutorial actions, as long as the challenged acts were not those that "a reasonable [person] would recognize as being clearly outside his jurisdiction," *id.* at 502 (citation and internal quotation marks omitted). Because "a reasonable attorney in [the attorney]'s position could have concluded that she owed a duty to her client," since a new lawyer had not been appointed to replace her at the time of the challenged conduct, we held that she "did not act in a clear absence of authority" and was therefore entitled to absolute immunity. *Id.* at 504.

Appellees claim that the requests for orders pertaining to Mother's custodial rights are entitled to absolute immunity under *Ernst* because they constitute protected advocacy. (*See* Appellees' Br. at 42 ("Requesting … an order is 'petitioning'

27

the court, and providing any testimony constitutes 'making recommendations to the state court' and/or 'acting as an advocate in judicial proceedings' … .").)  The District Court accepted that argument, understanding our precedent in *Ernst* to mean that "there must be a judicial court order before … social workers … [may] receive absolute immunity."  (Joint App. at 24.)  The District Court was satisfied that, in this case, that prerequisite was effectively satisfied because "the acts [Eller and Barth] performed in seeking a judicial order transferring custody from the Natural Mother to the Natural Father were closely associated with the judicial process."  (*Id.* at 25.)

Mother argues that the District Court ignored that, in this case, unlike in *Ernst*, dependency proceedings were never initiated; the County instead requested that the Court issue an order in response to a caseworker's summary[23] and, in so doing, avoided affording Mother automatic process under state law.[24]  Thus, she argues, the checks on unconstitutional conduct that were part of the justification for extending

---

[23] Appellees refer to this process as a "Summary and Order procedure."  (*See, e.g.*, Appellees' Br. at 23.)

[24] There is a "heads-I-win, tails-you-lose" quality to the Appellees' assertion that, on the one hand, the lack of dependency proceedings means there was no obligation to afford Mother a prompt post-removal hearing, *see supra* Part I.C, while, on the other hand, the alleged similarity between the County's Summary and Order procedure and dependency proceedings means that Eller and Barth should be absolutely immune.  We reach our holding in spite of and not because of that somewhat inconsistent line of argument.

absolute immunity in that case simply do not exist here. *See Ernst*, 108 F.3d at 497 ("Finally, as with prosecutors, there are alternative mechanisms other than the threat of § 1983 liability that protect the public against unconstitutional conduct by child welfare workers.").

That argument is not without logical force. The availability of "alternatives to damages suits against the official as [a] means of redressing wrongful conduct" is a factor that we must consider when assessing whether a government official is entitled to absolute immunity. *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992); *see id.* ("Three factors determine whether a government official should be given absolute immunity for a particular function: 1) whether there is a historical or common law basis for the immunity in question; 2) whether performance of the function poses a risk of harassment or vexatious litigation against the official; and 3) whether there exist alternatives to damage suits against the official as means of redressing wrongful conduct." (citation and internal quotation marks omitted)); *cf. Butz*, 438 U.S. at 512 ("Because the[] features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.").

Ultimately, however, Mother's contention is overstated. As a careful comparison of this case to *Ernst* reveals, the same sorts of protection we identified there actually do apply here with respect to the caseworkers' function of seeking judicial orders related to custody of Daughter. First, as is true of dependency proceedings, "the judicial process itself" provided some check against wrongful

29

conduct under the procedure the County employed in removing Daughter from Mother's home. *Ernst*, 108 F.3d at 497. Although the County's protocol did not include the post-removal hearing that dependency proceedings include, Daughter's removal was nevertheless effectuated only after Eller presented her findings to "a neutral judge whose decisions [were] guided by [Daughter's] best interests." *Id.* (internal quotation marks omitted). Second, even without following the protocols for removing a child in dependency proceedings, the agency in this case had the incentive we described in *Ernst* "to ensure that its employees do not violate constitutional rights because it is not immune from suit for abuses committed by employees with policy-making authority or acting pursuant to agency policy or custom." *Id.* Thus, although *Ernst* is certainly distinguishable in that absolute immunity was available to child welfare workers "for their actions on behalf of the state in preparing for, initiating, and prosecuting *dependency proceedings*," *id.* at 495 (emphasis added), that distinction is not dispositive as far as the availability of "important safeguards that protect citizens from unconstitutional actions" goes. *Id.*

Nor is Mother's argument persuasive as to the "functions performed" or the "public policy considerations" we identified in *Ernst*. *Id.* Like caseworkers who present their findings during dependency proceedings, the caseworkers here were forced to act quickly to protect a child from perceived neglect or abuse and had to exercise independent judgment in doing so. *See id.* at 496-97. After speaking with Dr. Lindblad, Eller discussed the matter with Barth and decided it was necessary to initiate a ChildLine report so as to "report allegations of serious physical neglect" (Joint App. at 463), that would enable her to promptly secure

a court order to have Daughter removed from Mother's care and to protect Daughter from further abuse. The specter of § 1983 liability in future cases could well impede the ability of Eller and others in her position to take action in an emergency. We therefore believe that *Ernst*'s absolute immunity for child welfare employees is appropriate when the employee in question "formulat[es] and present[s] … recommendations to the court" with respect to a child's custody determination, even if those recommendations are made outside the context of a dependency proceeding.[25] *Ernst*, 108 F.3d at 495.

Having determined that the absence of dependency proceedings is not, in itself, a basis for resolving the absolute immunity question, we must now consider whether Eller and Barth were, in fact, formulating and presenting recommendations to a court when they undertook the conduct of which Mother complains. In other words, we need to ascertain whether Eller and Barth "function[ed] as the state's advocate when performing the action(s)" that gave rise to the due process violations Mother seeks to redress, or whether those claims instead arose from unprotected "administrative or investigatory actions." *Odd*, 538 F.3d at 208; *see Ernst*, 108 F.3d at 495, 497 n.7 (noting immunity for caseworkers

---

[25] The dissent contends that the absence of dependency proceedings requires that we deny absolute immunity. That, however, would unnecessarily convert what is a feature of some immunity cases into a prerequisite for immunity in all child welfare cases. Our focus should be, instead, on whether the function of the child welfare worker, while engaged in the challenged act, was prosecutorial. *See Ernst*, 108 F.3d at 495 (emphasizing the import of the function performed).

31

includes "the formulation and presentation of recommendations to the court" but that we would not "accord absolute immunity to 'investigative or administrative' actions taken … outside the context of a judicial proceeding"). The question is "what function … th[eir] act[s] served," *Schneyder v. Smith*, 653 F.3d 313, 332 (3d Cir. 2011). We address that question first with regard to the acts underlying the alleged procedural due process violations, and then turn to the substantive due process claims.

## 2. *Procedural Due Process*

The procedural due process claims arose when Eller and Barth, with the County's approbation, removed Daughter from Mother's custody by presenting *ex parte* conclusions about Daughter's welfare to Judge Cascio on May 5, 2006, and perpetuated that removal through a second *ex parte* meeting on June 23, 2006. [26] In each of those meetings, Eller, on behalf of the County and under Barth's supervision, recommended that the court issue an order depriving Mother of custody of Daughter. Such actions are "intimately associated with the judicial process in much the same way as are a prosecutor's actions in representing the state in criminal prosecutions." *Ernst*, 108 F.3d at 496 (internal quotation marks omitted). Inasmuch as their acts were fundamentally prosecutorial, in the manner described in *Ernst*, we conclude that Eller and Barth are absolutely immune from liability with

---

[26] We address the procedural due process claims against the County *infra* Part III.B. Here, for purposes of the absolute immunity determination, we address only those claims against Eller and Barth.

32

respect to the procedural due process claims.[27] *See id.* at 495 (according immunity for "the formulation and presentation of recommendations to the court").

[27] Our dissenting colleague argues that there can be no absolute immunity for the procedural due process claims because the caseworkers lacked "statutory authorization to approach the judge to request" the orders. (Dissent at 4; *see id.* at 16 (discussing the second ex parte meeting).) That authorization was lacking, he claims, because the caseworkers "merely initiat[ed] a custody process between parents," a process not included in the statutorily permitted circumstances under which caseworkers can seek a removal order. (*Id.* at 7.) It is certainly true that absolute immunity does not protect acts in a "complete and clear absence of authority." *Snell*, 920 F.2d at 694. The question of whether an act can be so characterized, however, is assessed from the perspective of the objectively reasonable caseworker, "without reference to the official's subjective state of mind." *Ernst*, 108 F.3d at 502. We disagree with the suggestion in the dissent that the caseworkers here could not have reasonably believed their actions were in furtherance of their authority. In *Ernst*, we determined that the lawyer who had been removed from serving on the agency's behalf "did not act in a clear absence of authority" because she could have reasonably "concluded that she owed a duty to her client" under the circumstances. *Id.* at 504. So too here. There can be no question that it was proper for the caseworkers to endeavor to protect Daughter, *see* 55 Pa. Code § 3490.53(b) ("The county agency shall protect the safety of the subject child and other children in the home … and shall provide or arrange appropriate services when necessary during the investigation period."), and the purpose of both the May 5

33

### 3. *The Substantive Due Process Claim*

That, however, does not definitively settle the absolute immunity question in this case, because the substantive due process claim with respect to Eller remains to be addressed.[28]

and June 23 orders was to do just that. Even if Pennsylvania law requires that purpose to be effectuated by other means than the procedure undertaken here, it cannot be persuasively said that a reasonable caseworker would believe that she had acted "in a clear absence of authority" in procuring the May 5 and June 23 orders. *Ernst*, 108 F.3d at 504.

[28] Although Mother brings this claim against all of the Appellees, she fails to identify any action by Barth that amounts to a substantive due process violation, instead focusing entirely on Eller's conduct. (*See* Appellant's Opening Br. at 58 ("[A] jury could conclude that *Eller* was deliberately indifferent … and … acted in a grossly negligent manner." (emphasis added)); *id.* at 61 ("[A] jury could find that *Eller's* conduct shocks the conscience … ." (emphasis added)).) We conclude, therefore, that Mother has waived any challenge to the District Court's ruling that Barth is entitled to summary judgment on the substantive due process claim. *See Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 202-03 (3d Cir. 2004) ("We have held on numerous occasions that [a]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court." (alteration in original) (citation and internal quotation marks omitted)). We address the County's substantive due process liability *infra* Part III.B, and thus address only Eller's substantive due process liability here.

Mother contends that that claim arose when Eller removed Daughter on May 5, 2006, based on misrepresented medical evidence (*see* Appellant's Opening Br. at 52 (arguing that Eller "concoct[ed] facts to convince Judge Cascio that he should permit the separation of Daughter from Mother coupled with the absence of information, which would justify removal")), and when Eller subsequently "manipulat[ed] [the] evidence associated with the ChildLine report investigation" and presented that report's conclusions to Judge Cascio on June 23, 2006, as the basis for her recommendation that Mother not regain custody of Daughter (*id.*). As the immunity analysis hinges on the specific function served by Eller's actions, we address each of those actions in turn.

a.    *Daughter's Initial Removal*

Mother contends that Eller's initial removal of Daughter on May 5, 2006 constitutes a substantive due process violation because Eller improperly relied on a report from Dr. Lindblad and misrepresented Daughter's weight on the summary she prepared for Judge Cascio. That claim presents a difficult immunity issue. Although Eller eventually presented her recommendations to a court, and is entitled to absolute immunity for that under *Ernst*, her solicitation of information from Dr. Lindblad and the compilation of her findings into an abuse report occurred prior to the initiation of judicial proceedings. *See Ernst*, 108 F.3d at 497 (holding that "formulation and presentation of recommendations to the state" is entitled to absolute immunity, but declining to accord immunity to "investigative or administrative" actions (citation omitted)). Mother's claim thus raises the question of precisely where to draw the line between a child welfare employee's investigative and

35

prosecutorial functions, an issue that is not clearly addressed by our holding in *Ernst*.

But we do not need to answer that question today because, even if we were to conclude that Eller was not entitled to absolute immunity, no rational jury could find that her initial removal of Daughter violated Mother's substantive due process rights. In *Miller v. City of Philadelphia*, 174 F.3d 368 (3d Cir. 1999), we held that a substantive due process claim requires "decision-making by a social worker that is so clearly arbitrary … [that it] can properly be said to 'shock the conscience.'" *Id.* at 376; *see also Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123, 1124–26 (3d Cir. 1997). In so holding, we observed that "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case," because a "higher fault standard is proper when a government official is acting instantaneously and making pressured decisions without the ability to fully consider their risks." *Miller*, 174 F.3d at 375. In such situations, the "standard of culpability" necessary for a child welfare employee's actions to shock the conscience must generally "exceed both negligence and deliberate indifference." *Id.*

Eller's actions on May 5 may not be free from fault, but they cannot be said to shock the conscience. When Eller removed Daughter on May 5, she acted quickly upon information from a physician who had been treating Daughter over the course of several months. Dr. Lindblad told Eller of medical evidence that indicated serious neglect. Although he had not seen Daughter for approximately two-and-a-half weeks, Dr. Lindblad knew enough about her case to cogently

36

describe the discrepancy between her growth during her inpatient care at the Children's Institute as compared with her growth under Mother's care. Based on Eller's discussion with Dr. Lindblad, it was reasonable to take the steps she did to protect Daughter from Mother until there had been time to investigate further. Considered in that context, Eller's misstatement that Daughter weighed 19 pounds, *see supra* note 16 and accompanying text, cannot be viewed as more than mere negligence, especially because the material facts relayed by Dr. Lindblad that led Eller to act were all accurately stated in her summary to Judge Cascio. We conclude, therefore, that no rational jury could find that Eller's actions leading to the May 5 removal of Daughter infringed upon Mother's substantive due process rights.

b.    *Eller's Subsequent Actions*

Mother next argues that the way Eller handled her subsequent investigation and report could support a jury verdict in Mother's favor on the substantive due process claim. Specifically, Mother argues that Eller excluded from her analysis the May 5 and May 8 weigh-ins, which suggested that Daughter had improved under Mother's care. According to Mother, that omission demonstrates that Eller acted either with a desire to manipulate the evidence or with deliberate indifference to the truth, either of which would be sufficient to support a jury verdict in her favor on the substantive due process claim.

To resolve whether Eller is absolutely immune from liability with respect to that claim, we turn to the question of "what function (prosecutorial, administrative, investigative, or something else entirely)" the acts of preparing the report

and presenting its conclusion to Judge Cascio served.[29] *Schneyder*, 653 F.3d at 332. That mode of analysis does not lend itself to easy resolution in this case. Although Eller "present[ed]" her "formulat[ed]" conclusions to Judge Cascio, which could entitle her to absolute immunity, *Ernst*, 108 F.3d at 495, the conclusions she reported were derived from the abuse report she prepared for the state which, on its own, plainly would not, *see id.* at 497 n.7 ("[W]e would be unwilling to accord absolute immunity to *investigative … actions taken …* outside the context of a judicial proceeding" (emphases added) (internal quotation marks omitted)). There would, in fact, be no serious basis for Eller to posit that she acted as a quasi-prosecutor had she never secured a temporary removal order from Judge Cascio or presented her report's conclusions to Judge Cascio after filing the report with the state, because her function in investigating potential child abuse and preparing a report required under state law does not approximate legal advocacy. *See Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) ("[S]ocial workers are

_____

[29] We reach this issue with regard to this claim, unlike with the claim arising from Eller's May 5 conduct, because Mother has a much stronger case that her substantive due process rights were violated by Eller's subsequent actions. Eller's failure to mention the May 5 and May 8 weigh-ins in her report, combined with evidence in the record that she had a contentious relationship with Mother (*see* Joint App. at 310 (describing how Eller found Mother "very offensive from the beginning of [their] relationship")), could potentially, upon further analysis, support a determination that a rational jury might conclude that her behavior shocked the conscience. Thus, we must address whether Eller's conduct is protected by absolute immunity.

38

absolutely immune only when they are acting in their capacity as *legal advocates* – initiating court actions or testifying under oath – not when they are performing administrative, investigative, or other functions.").

But the presence of an investigative component to Eller's conduct does not bar the application of absolute immunity when the function of her actions is still fundamentally prosecutorial in nature. In *Ernst*, we noted that "[t]he Supreme Court has explicitly rejected the idea that absolute prosecutorial immunity extends only to the act of initiation itself and to conduct occurring in the courtroom." *Ernst*, 108 F.3d at 497 (citation and internal quotation marks omitted). Rather, absolute immunity can protect acts undertaken "in prepar[ation] for the initiation of judicial proceedings," so long as they fall within a prosecutor's "role as an advocate for the state." *Id.* at 497–98 (citation omitted). Extending that reasoning to apply to child welfare employees, we concluded in *Ernst* that absolute immunity protects not only caseworkers' presentations of their recommendations to a court, but also their "gathering and evaluation of information" to formulate those recommendations and to prepare for judicial proceedings. *Id.* at 498. To hold otherwise, we explained, would expose caseworkers to liability "for the observations and judgments that were the necessary predicate" for their protected recommendations, which would "eviscerate the immunity they did receive and undermine the purposes sought to be advanced by the grant of absolute immunity." *Id.*

Here, the further investigation that Eller undertook after Judge Cascio's initial order, and the subsequent ChildLine report that Eller filed, were part of an ongoing

39

judicial proceeding throughout which she served as an advocate for the state. As described above, *see supra* Part III.A.2, Eller assumed a fundamentally prosecutorial role during the May 5 hearing, arguing on behalf of the County for Daughter's removal from Mother's care. Following that initial removal, Eller undertook her investigation with the understanding that her conclusions would be considered in a subsequent custody determination. Judge Cascio's May 5 order placed Daughter in Father's custody only "until the completion of the investigation," indicating that a second determination would be made "pending [its] result." (Joint App. at 468.) During the June 23 hearing, when that second determination was made, Eller again represented the County in recommending that the temporary change of custody be made permanent. Her investigation was thus conducted in the context of an open judicial proceeding, throughout which her overall role was analogous to that of a prosecutor. *See Ernst*, 108 F.3d at 496 (establishing that caseworkers' actions are protected to the extent that they are "intimately associated with the judicial process in much the same way as are a prosecutor's actions in representing the state in criminal prosecutions" (internal quotation marks omitted)).

In addition to serving in a prosecutorial capacity, Eller's specific actions were akin to a prosecutor's preparations for trial. *Cf. Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor."). During her investigation, Eller was "gathering and evaluat[ing] information" in preparation for an upcoming judicial proceeding, *see Ernst* at 498 (extending absolute immunity to such preparations), and the observations and judgments compiled in her ChildLine report served as the

40

basis for her recommendations to Judge Cascio on June 23, 2006. In *Ernst*, we expressed concern that excluding such "observations and judgments" from immunity when they form the "necessary predicate" for protected recommendations would "undermine the purposes sought to be advanced by the grant of absolute immunity." *Id.* That concern is similarly implicated here. If we protect Eller when she presents her recommendations to a judge, but allow her to be sued for preparing the report that she intends to present, absolute immunity has offered her no real protection; she will still have to defend in court the basis for her decision to recommend removal. *Cf. Yarris*, 465 F.3d at 135 (concluding that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation" (citation and internal quotation marks omitted)).

We therefore conclude that Eller's actions are protected by absolute immunity with respect to Mother's substantive due process claim. We emphasize, however, as we did in *Ernst*, that this holding does not insulate from liability all actions taken by child welfare caseworkers. *See id.* at 497 n.7 ("[W]e would be unwilling to accord absolute immunity to investigative or administrative actions taken by child welfare workers outside the context of a judicial proceeding." (citation and internal quotation marks omitted)). Investigations conducted outside of the context of judicial proceedings may still be susceptible to due process claims. Nor can caseworkers shield their investigatory work from review merely by seeking a court order at some point. *See Buckley*, 509 U.S. at 276 ("[A] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because … that work may be retrospectively

41

described as 'preparation' … ." (citation omitted)).  The key to the absolute immunity determination is not the timing of the investigation relative to a judicial proceeding, but rather the underlying function that the investigation serves and the role the caseworker occupies in carrying it out.  *See Schneyder*, 653 F.3d at 332 ("The court must ascertain … what conduct forms the basis for the plaintiff's cause of action, and … then determine what function … that act served.").  Here, Eller advocated on behalf of the County in the May 5 meeting and continued in that role through the June 23 custody determination.  Because the underlying function of her actions throughout that judicial proceeding – including during the investigation and composition of the report – was fundamentally prosecutorial in nature, she is entitled to absolute immunity for this claim.

### B.  *Due Process Claims Against the County*

Having concluded that none of the claims against Eller and Barth are viable, we turn now to Mother's due process claims against the County.  Mother contends that the County violated her procedural due process rights by failing to afford her a prompt post-removal hearing after Daughter was removed from her custody on May 5, 2006, and through Eller's actions in meeting *ex parte* with Judge Cascio on June 23, 2006, and providing him with what Mother alleges is false information about her treatment of Daughter.  She also argues that the County violated her substantive due process rights because Daughter's removal was based on Eller's "concoct[ed] facts" and "manipulate[ed] … evidence." (Appellant's Opening Br. at 52.)

42

1.      *Failure to Provide a Post-Removal Hearing*

Due process is implicated when protected interests such as a parent's liberty interest "in the custody, care and management of [his or her] children" are subjected to intrusion by the state. *Croft*, 103 F.3d at 1125. An individual must ordinarily be afforded "the opportunity to be heard 'at a meaningful time and in a meaningful manner'" before any such intrusion. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The extent of that obligation is, as the Supreme Court has instructed, a flexible one, based upon a balance of several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. Thus, when a parent complains of state action intruding on the "parent-child relationship," the parent's interest must "be balanced against the state's interest in protecting children suspected of being abused." *Miller*, 174 F.3d at 373. While the question of what constitutes due process is necessarily rooted in the circumstances of a given case, it is axiomatic that at least some process is required

when a "state seeks to alter, terminate, or suspend a parent's right to the custody of [her] minor children." *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003).

Mother, as noted, argues that her procedural due process rights were violated here because she was afforded no hearing when Daughter was removed through the County's practice of transferring custody to another guardian. *See supra* Part I.C. Indeed, Mother's first opportunity to protest her Daughter's removal was when she appeared before Judge Cascio 40 days later in connection with the habeas corpus proceedings that she herself had initiated.

Adopting the arguments of the Appellees, the District Court concluded that Mother's procedural due process rights were not violated. It reasoned that the May 5, 2006 order "did not terminate all parental custody rights" but instead "transferred primary custody from the Natural Mother to the Natural Father and provided for supervised visitation of the Natural Mother with the Minor Child." (Joint App. at 36.) The Court further concluded that Mother was "receiving and has received due process" because she had the opportunity to schedule a hearing and because "[t]he period of forty-five days during which [the County] concluded its [abuse] investigation was not an overly lengthy deprivation of the Natural Mother's status as primary custodian pending the completion of the investigation." (*Id.* at 36-37.) While the District Court was right to consider the degree to which the order intruded upon Mother's rights in ascertaining what process was due under the circumstances, *see Mathews*, 424 U.S. at 335 (instructing courts to consider "the private interest that will be affected by the official action"), we cannot agree with its conclusion that Mother received due process.

44

Even if *Mathews*'s flexible standard permitted less process here than in a case where the state takes custody of a child – and that is a question on which we express no opinion at this time – that would not mean that no hearing was needed to address the deprivation effected by the removal of Daughter from Mother's custody. The deprivation of a parent's custodial relationship with a child is among the most drastic actions that a state can take against an individual's liberty interest, with profound ramifications for the integrity of the family unit and for each member of it. From the parent's perspective, there may be little meaningful difference between instances in which the state removes a child and takes her into state custody and those in which the state shifts custody from one parent to another, as occurred here. In either case, the government has implicated a fundamental liberty interest of the parent who loses custody. The state has caused a deprivation and risks having done so wrongly. *See id.* (noting "the risk of an erroneous deprivation" must be considered). Therefore, assuming the "fiscal and administrative burdens," *id.*, of affording such parents a prompt post-removal hearing do not outweigh the need for one – and it is hard to imagine when they would – such a hearing ought to be held.[30] *Cf. Berman v. Young*, 291 F.3d 976, 985 (7th Cir. 2002) ("When the state removes a child

---

[30] It seems plain that requiring a prompt post-removal hearing would not impose a substantial administrative or financial burden upon the government in this case, primarily because such a hearing is already required whenever a county agency petitions the court for a finding of dependency. *See supra* note 11 and accompanying text.

45

from her parents, due process *guarantees prompt and fair post-deprivation judicial review*." (emphasis added)).

It is no adequate response to say, as the District Court did and as the County continues to argue, that Mother was given an opportunity to be heard because she filed a habeas petition on her own and received a hearing in connection with that. Some courthouse somewhere may be open to someone aggressive and knowledgeable enough to initiate legal action, but that does not meet the state's burden of providing an "opportunity to be heard at a meaningful time and in a meaningful manner" to a parent deprived of custody, *Mathews*, 424 U.S. at 333 (citation and internal quotation marks omitted), particularly when, as here, no notice was ever given as to how a hearing could be scheduled and the hearing occurred 40 days after Daughter's removal.[31] *Cf. Berman*, 291 F.3d at 985 (referring to "prompt and fair post-deprivation judicial review"). Nor is it sufficient that Mother's custodial rights were eventually addressed after Eller's abuse investigation was concluded. The constitutional deprivation at issue at this point is Daughter's initial removal from Mother's home, so being heard much later, after the deprivation, fails to address the harm.

---

[31] Because it is uncontested that Appellees failed to initiate a post-removal hearing in this case, we need not, and do not, opine on the precise contours of the process that Mother was due. Speaking generally, however, it should be obvious that a hearing 40 days later is not sufficiently prompt. The delay should ordinarily be measured in hours or days, not weeks.

46

Of course, "[t]he right to familial integrity … does not include a right to remain free from child abuse investigations." *Croft*, 103 F.3d at 1125. However, in view of the extremely important liberty interests at stake here, due process required the County to offer Mother a chance to be promptly heard after they took Daughter from her home, regardless of whether or not state law independently imposed that obligation. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (the question of "what process is due" is a matter of constitutional law, not state law (citation and internal quotation marks)). And because there is no dispute about the historical fact that Mother was not offered the post-removal hearing to which she was constitutionally entitled, we agree with Mother that the District Court should have determined that the County violated her right to procedural due process.[32]

---

[32] Had the County acted pursuant to a "protective custody order," rather than via an order transferring custody between parents, its failure to provide a prompt hearing may have also violated Pennsylvania law. *See* 42 Pa. Cons. Stat. Ann. § 6324(1) (permitting the state to take a child into custody pursuant to "a protective custody order removing a child from the home of the parent, guardian, or custodian" if the courts determines "that to allow the child to remain in the home is contrary to the welfare of the child"). As described above, *see supra* note 11, Pennsylvania law requires that an informal hearing be held if protective custody is maintained for longer than 72 hours. 23 Pa. Cons. Stat. Ann. § 6315(d). Here, however, the County never claimed to be taking Daughter into protective custody, and it transferred Daughter to Father's care well before 72 hours had elapsed.

That, however, does not end our inquiry, because we must also determine whether that due process irregularity resulted in some damage. *See Carey v. Piphus*, 435 U.S. 247, 264 (1978) (holding that a plaintiff asserting a procedural due process claim under § 1983 must introduce proof of damages arising from the alleged due process violation in order to recover actual damages). The County argues that it did not, claiming that regardless of "the sufficiency of the process granted … plaintiffs [cannot] demonstrate that such process would have borne a different result." (Appellees' Br. at 29.) Thus, the County says, the District Court appropriately entered judgment in its favor. That is mistaken.

If nothing else, the violation of Mother's right to procedural due process would be a basis for awarding nominal damages. *See Carey*, 435 U.S. at 266 ("[W]e believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury."); *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1286 (10th Cir. 2007) ("Even when one does not prove any compensable damages from a due process violation, under Section 1983 a cause of action and nominal damages remain available."). More importantly, however, there could be a finding of actual damages.

The County is blind to that prospect. It asks us to hold that no rational jury could conclude that a post-removal hearing would have made a difference, because, as the County sees it, no one could think the underlying facts are the least ambiguous: Mother was starving Daughter, and that's that. But Daughter was weighed on May 5 and May 8, immediately after having been in Mother's care, and those weights demonstrated a noteworthy improvement in her

48

condition. For that very reason, Dr. Lindblad testified that he likely "would have waited until another opportunity to examine [Daughter] before calling the ChildLine," if he had been aware of the May 5, 2006 weight of "22 pounds, 2 ounces." (Joint App. at 369.) Another expert wondered why Daughter was removed, since she had shown meaningful improvement while in Mother's then-recent custody. (*See id.* at 695 ("It is unclear to me why the child was removed on a day when she showed significant weight gain for the first time while under the mother's care.").) Daughter's May 5 and May 8 weights could have come to light if a post-removal hearing had been conducted,[33] and, given the significance of those weights, a reviewing judge may have ordered Daughter to be returned to Mother's custody if the judge accepted Mother's account of how the weigh-ins were conducted.[34] In

---

[33] Appellees have not directed us to any evidence that the May 5 and May 8 weights were brought to Judge Cascio's attention at the hearing on Mother's habeas corpus petition, and we have found none in the appellate record. Even if the new weights were discussed at that hearing, we would not necessarily reject Mother's claim to damages, as the primary issue at that hearing was not whether Daughter's removal was appropriate but, rather, whether the state had an obligation to conduct a post-removal hearing under the CPSL, given that Daughter had not been taken into state custody.

[34] There are serious questions as to whether the May 5 and May 8 weights were valid results. Our dissenting colleague indicates that Daughter must have been clothed when she weighed in at 22 pounds, 2 ounces because Eller made that first-hand observation on May 5. (*see* Dissent at 13 (arguing that Daughter "was clothed during [the May 5] weigh-in").) So do Appellees, relying on Eller's testimony

short, it is not obvious that the custody determinations would have been the same, had the information regarding the May 5 and May 8 weights been fully aired.

The only remaining question, then, is whether the County is accountable to Mother for whatever damages a jury finds she sustained as a result of that constitutional

---

that Daughter was clothed when she was weighed on May 5 and May 8. If a jury accepts that testimony, as the dissent does, it may find that Mother suffered no damages in connection with the procedural due process violation committed here. However, despite any suggestion to the contrary, that testimony is not uncontroverted; Daughter's medical record from Berlin Pediatrics lists those weights, and the only indication that Daughter was clothed was added by Eller herself. *See supra* note 17. That Berlin Pediatrics recorded Daughter's weights as having increased is undisputed. Eller's notation and testimony are disputed, however, as a physician from that practice testified that it was the "standard practice" to weigh a child such as Daughter "without … clothes." (Joint App. at 371.) Although that physician did not observe Daughter being weighed on May 5 or May 8, we disagree with the dissent's implicit conclusion that the physician's testimony about the way the clinic conducted weigh-ins could not be accepted by a rational jury and lead the jury to then question Eller's account of how the May 5 and May 8 weights were taken. (*See* Dissent at 13 (noting that the doctor "never challenged Eller's testimony that, in essence, his protocol was not followed on that occasion").) We do not imply how this factual dispute ought to be resolved; we only note that the dispute exists.

violation.[35]     With respect to municipalities such as the County, that inquiry turns on whether the due process violation was a result of the County's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978).   A policy is a decision of a municipality's "duly constituted legislative body" or of "officials whose acts may fairly be said to be those of the municipality." *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-04 (1997).   A custom is a practice that, although "not … formally approved by an appropriate decisionmaker … is so widespread as to have the force of law." *Id.* at 404.  "In either of these cases, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990); *see Chambers ex rel. Chambers v. Sch. Dist. of Phila Bd. of Educ.*, 587 F.3d 176, 193 (3d Cir. 2009) (same).

Although the record does not support a conclusion that the County has a formal policy against providing hearings for parents such as Mother, the evidence does demonstrate, as the County essentially admits in its briefing (*see* Appellees' Br. at 23 (referring to the County's "Summary and Order procedure")), that, amidst abuse allegations, the County has a custom of removing children from a parent's home without conducting a prompt post-removal hearing if another parent

---

[35] As discussed above, *see supra* Part III.A, we conclude that Eller and Barth are absolutely immune from liability relating to the failure to afford Mother a prompt post-removal hearing.

can take custody. Hunt, the Assistant Director of Somerset County Children and Youth Services, testified that the procedure employed to remove Daughter from Mother's custody without a hearing is utilized in circumstances in which there is a "fit-and-willing parent" to be "given the right by the court to care for the child." (Joint App. at 330.) Douglas Walters, a caseworker supervisor at Somerset County Children and Youth Services, elaborated that the process is used several times each year, explaining that caseworkers at the agency would know they could "obtain an order to stop contact until [the agency] could investigate" in a case such as Mother's (*id.* at 339-340), because they would be informed of that option "through discussions and meetings, ongoing meetings, … with the[ir] supervisors," (*id.* at 340).

Thus, while the relevant policymaker is not readily apparent,[36] the evidence shows conclusively that, when a non-

---

[36] "The question of who is a 'policymaker' is a question of state law," to be addressed by a court, not a jury, in "determin[ing] which official has final, unreviewable discretion to make a decision or take an action." *Andrews*, 895 F.2d at 1481. Here, the District Court never determined who the relevant policymaker was, since it simply determined that Mother's constitutional rights were not violated. Although we think it likely that Hunt would qualify as a policymaker for *Monell* purposes, the record and briefing is not sufficient to enable us to definitively answer that question in the first instance. We need not direct the District Court to consider that issue afresh on remand, however, because while "the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge," *Jett v. Dallas*

custodial parent is available to take a child, it is customary for the County to temporarily suspend the other parent's custody rights without a hearing, when abuse is suspected. That custom was utilized with official approbation in this case. And, because there is no question that what the County calls its "Summary and Order procedure" (Appellees' Br. at 23) violated Mother's right to a prompt post-removal hearing, we conclude that the County is liable under § 1983 for whatever damages a jury may deem appropriate to redress that violation. *See Andrews*, 895 F.2d at 1480 (stating that liability attaches "only when execution of a government's policy or custom … inflicts the injury" (citation omitted)).

### 2. *Other Due Process Claims Against the County*

We now briefly turn to Mother's second procedural due process claim against the County, which arises from Eller's *ex parte* report of the child abuse investigation to Judge Cascio on June 23, 2006, and to her substantive due process claim. There is no evidence supporting § 1983 liability against the County for either claim. Mother does not allege that the June 23, 2006 meeting with Judge Cascio was

*Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), Appellees' effective admission of a custom obviates any need to have a court "determine, by reference to local law, which … officials had final policymaking authority," *Simmons v. City of Phila.*, 947 F.2d 1042, 1065 (3d Cir. 1991) (Becker, J., concurring); *cf. id.* at 1089 n.1 (Sloviter, J., concurring) ("I do agree … with Judge Becker's conclusion … that the City waived its claim that plaintiff failed to identify the responsible [policymaker] … .").

53

made pursuant to any policy or custom. Lacking such evidence, we must conclude that the District Court was correct in holding that the County is not liable under § 1983 for any alleged constitutional harm arising from that meeting. *See Monell*, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). Similarly, Mother's substantive due process claim focuses entirely on Eller's conduct, alleging that her "concoct[ion] [of] facts" and "manipulation of evidence" to effectuate Daughter's removal was so egregious that it "shocks the conscience." (Appellant's Opening Br. at 52-53.) Because Mother provides no evidence that the County had a policy or custom endorsing such behavior, if it occurred, we agree with the District Court that the County is entitled to summary judgment on the substantive due process claim as well.

## IV.    Conclusion

For the foregoing reasons, we affirm in part and reverse in part the District Court's order. We affirm the District Court's order to the extent it awarded judgment in favor of Eller and Barth on the procedural due process claims; awarded judgment to all Appellees on the substantive due process claims; and awarded judgment to the County on the procedural due process claim as it relates to the June 23 meeting. We reverse the District Court's denial of summary judgment to Appellant on her procedural due process claim against the County for its violation of her right to a post-removal hearing, and we remand this case for a trial on the damages associated with that violation.

54

*B. S., and B.S. as guardian and parent of T.S., G.S., and N.S., v. Somerset County; Somerset County Children and Youth Services; Jessica Eller; Julie Barth*, No. 11-1833.

Nygaard, Circuit Judge, concurring in part, dissenting in part.

I agree with the majority that the May 5, 2006 meeting between Eller and Judge Cascio violated procedural due process, and that the County is liable for this violation. I also agree that caseworkers Eller and Barth are immune from liability on this issue. I write separately because I disagree with the majority on the type of immunity that should be extended to Eller and Barth, and because I differ on the scope of the procedural due process remand.

As to the June 23, 2006 ex parte meeting, I conclude that Eller violated procedural due process, and I would not grant her any immunity on this claim. Nonetheless, I would instruct the District Court to award only nominal damages.

Finally, I agree with the majority that B.S.'s substantive due process claim regarding M.N.'s initial removal from B.S.'s house does not have any merit. However, I reach the same conclusion on all of B.S.'s substantive due process claims. As a result, I do not find any error in the District Court's grant of summary judgment on these claims.

*May 5, 2006 Ex Parte Meeting*

*Absolute Immunity*

In light of our long tradition of reluctance to extend the scope of immunity, I would not adopt the District Court's broad interpretation of *Ernst* as to the May 5, 2006 meeting between Jessica Eller and Judge Cascio, applying absolute immunity anytime a court order has been issued, regardless of the context in which the order came about. I agree that a functional analysis is appropriate to assess whether it is proper to extend absolute immunity, but we must take care to provide such immunity only where it is clear that it comports with the larger concerns of procedural due process.

As the Supreme Court said:

> Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.

*Butz v. Economou*, 438 U.S. 478, 512 (1978). When a child welfare worker functions in the nature of a prosecutor in the context of a judicial process that provides for cross-examination and rebuttal (eliminating the need for collateral litigation to challenge the caseworkers conduct), the full array of considerations appropriate to absolute immunity are addressed. That is the significance, in *Ernst*, of our grant of absolute immunity to caseworkers in the context of dependency proceedings, a limitation ensuring that the parties and the court have ample opportunities to scrutinize the caseworker's conduct, decisions and recommendations. *Ernst*, 108 F.3d at 497; *see also* Juvenile Act (42 Pa.C.S. § 6324(1)); *see also* Child Protective Services Act (23 Pa.C.S. § 6315(a)(1)).

For this reason, I cannot accept the majority's affirmation of the District Court's formula for providing absolute immunity—essentially applying anytime a court is involved. It provides an overbroad standard that does not comport with fundamental concerns underlying absolute immunity. Although Eller's and Barth's conduct and conclusions were placed before a judge in a summary proceeding, their decisions and actions occurred within a process structured to ensure that they were never going to be subjected to cross examination or rebuttal. This is fundamentally at odds with our long-standing concern to extend absolute immunity only where procedural due process is available. Yet, my difficulty with the majority's conclusion goes far deeper.

The Court of Appeals for the Ninth Circuit said: "[S]tate law must authorize the prosecutorial or judicial function to which absolute immunity attaches." *Chalkboard,*

3

*Inc. v. Brandt*, 902 F.2d 1375, 1379 (9th Cir. 1989). I agree. In *Chalkboard*, the Court denied absolute immunity to state actors, ruling that the Arizona Department of Health Services was not acting within the "role assigned to it by state law" when it summarily closed a day care center. *Id.* The majority broadly analogizes Eller's and Barth's decisions and actions to those of a prosecutor both because they seem to fall in the category of functioning as a state advocate, and also because Eller interacted with the state court. But, even if we ignore the pro forma and insular nature of the interaction between Eller and Judge Cascio that call the prosecutorial analogy into question, a closer analysis reveals that Eller did not have any statutory authorization to approach the judge to request this particular order.

The starting point for understanding the state's authority in child welfare cases is the dependency process. "Before interfering with a parent's care and control of a child and ordering the intervention of an agency of the state, a court must first determine that the child is dependent." *In Interest of Theresa E.*, 429 A.2d 1150, 1155 (Pa. Super. 1981), citing 42 Pa.C.S. § 6341. However, in an emergency, a dependency determination is not necessary.[1] The Child Protective Services Law states the following:

---

[1] The Pennsylvania Superior Court said: "in a dependency proceeding, a court may grant custody of an allegedly dependent child to that child's non-custodial parent without first declaring the child dependent as long as sufficient evidence of dependency exists." *In Interest of Justin S.*, 543 A.2d 1192, 1198 n.2 (1988). The Pennsylvania Supreme Court went further, stating that "where a non-custodial parent is ready, willing, and able to provide adequate care to a child,

4

A child may be taken into custody: (1) Pursuant to an order of the court under this chapter. Prior to entering a protective custody order removing a child from the home of the parent, guardian or custodian, the court must determine that to allow the child to remain in the home is contrary to the welfare of the child. (2) Pursuant to the laws of arrest. (3) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary. (4) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child has run away from his parents, guardian, or other custodian. (5) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child has violated

_____

a court may not adjudge that child dependent." *In re M.L.*, 562 A.2D 46, 650 (2000).

5

conditions of his probation.

42 Pa.C.S. § 6324 (emphasis added). A treating physician or director of a hospital can take a child into protective custody for up to 24 hours if they determine a child to be in immediate danger. 23 Pa.C.S. §6315(1). After 24 hours, a county agency must get an order to authorize *an extension* of the protective custody. *Id.*

Somerset County, Eller and Barth say that they did not take M.N. into protective custody, nor did they ask the court to commence a dependency proceeding to determine the status of the child. Instead, they say, they were merely transferring custody between parents. As they were keen to note throughout their argument, this distinction goes far beyond mere semantics because by seeking this order—unlike a protective custody order—they avoided all hearing requirements.

The Child Protective Services Law states that "[i]n no case shall protective custody under this chapter be maintained longer than 72 hours without an informal hearing under 42 Pa.C.S. § 6332." 23 Pa.C.S. § 6315. The hearing is held to determine:

> whether [the child's] detention or shelter care is required under section 6325 (relating to detention of child), whether to allow the child to remain in the home would be contrary to the welfare of the child . . . [and] [i]f the child is alleged to be a dependent child,

6

> the court or master shall also determine whether reasonable efforts were made to prevent such placement or, in the case of an emergency placement where services were not offered and could not have prevented the necessity of placement, whether this level of effort was reasonable due to the emergency nature of the situation, safety considerations and circumstances of the family.

42 Pa.C.S. § 6332. I conclude from this that the state has statutory authority to seek an order removing the child from a parent under two circumstances: following a court's determination of dependency; and through the mechanism of a protective custody order where the child is in imminent danger of harm. Appellees did neither of the above, removing the child under an order that merely transferred custody between parents. Again, in this case, the difference goes beyond mere semantics, since appellees viewed what they were doing as fundamentally different from the process established in the statutes. This, according to their own argument, is why their conduct did not need to be subjected to the same scrutiny that is dictated in the statutory processes. They were not initiating a dependency process, nor were they seeking a protective custody order. Rather, they were merely initiating a custody process between parents. They were functioning, therefore, in a different capacity. This is where the problem arises.

7

Pennsylvania law says the following regarding standing to bring custody actions.

> The following individuals may file an action under this chapter for any form of physical custody or legal custody: (1) A parent of the child. (2) A person who stands in loco parentis to the child. (3) A grandparent of the child who is not in loco parentis to the child: (i) whose relationship with the child began either with the consent of a parent of the child or under a court order; (ii) who assumes or is willing to assume responsibility for the child; and (iii) when one of the following conditions is met: (A) the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters); (B) the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or (C) the child has, for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which

8

> case the action must be filed within six months after the removal of the child from the home.

23 Pa.C.S.A. § 5324. The state is not given standing to, sua sponte, initiate court proceedings solely to alter the custody between parents. The problem is that by seeking a custody order rather than a protective custody order, they functioned outside of the statutory structure of the Child Protective Services Law and the Juvenile Act, and more important for immunity analysis, outside of their statutory authority.[2] The state has a broad mandate to protect children from abuse, but it must secure their safety in a manner that is consistent with their statutory authority. To receive the benefits of absolute immunity, child welfare workers, like prosecutors, must act within the confines of their legal authority. By stepping beyond this boundary, even if they were functioning prosecutorially, they crossed a bright line and placed themselves outside of the protective umbrella of absolute immunity.

---

[2] Pennsylvania courts have been careful to distinguish dependency proceedings from custody actions. "This Court has stated strong disapproval of the use of a dependency proceeding as a means of transferring custody of a child from one parent to another." *In re A.E.*, 722 A.2d 213, 215 (Pa. Super. Ct. 1998); citing *Helsel v. Blair County Children and Youth Services*, 519 A.2d 456, 460 (Pa.Super.1986); *In the Matter of Mark T.*, 442 A.2d 1179, 1182 (Pa.Super.1982) (Beck, J. concurring).

Therefore, for all of the above reasons, I disagree with the majority and conclude that it is not proper to extend absolute immunity to Eller and Barth for B.S.'s procedural due process claim arising from the May 5, 2006 ex parte meeting. [3]

*Qualified Immunity for the May 5, 2006 Meeting*

I would, instead, affirm the District Court's alternative ruling that Eller and Barth should receive qualified immunity. The qualified immunity analysis is focused on the "'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Montanez v. Thompson*, 603 F.3d 243, 251 (3d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (3d Cir. 2009). This "'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Gilles v. Davis*, 427 F.3d 197, 203 (3d Cir. 2005)). The analysis is objective, but still requires that we take into account the context in which

---

[3] This conclusion is further supported by the fact that the caseworkers were not requesting the court to "prosecute" anything: they were not seeking a court declaration regarding the status of the child, nor were they asking the court to adjudicate anything about B.S.'s conduct. Rather, they were merely attempting to unilaterally change the custody arrangement between the parents. Denying absolute immunity here is consistent with our recognition that such immunity requires "meticulous analysis" of a prosecutor's actions. *Odd v. Malone*, 538 F.3d 202, 208 (3d Cir. 2008).

Eller and Barth acted. Therefore, we must consider a number of factors.

First, Pennsylvania's legal landscape is somewhat confusing. As I noted above, the Pennsylvania Supreme Court said the following:

> [I]t is the duty of the trial court to determine whether the non-custodial parent is capable and willing to render proper parental control prior to adjudicating a child dependent. If the court determines that the custodial parent is unable to provide proper parental care and control "at this moment" and that the non-custodial parent is "immediately available" to provide such care, the child is not dependent under the provisions of the Juvenile Act. *Consequently, the court must grant custody of the allegedly dependent child to the non-custodial parent.* Once custody is granted to the non-custodial parent, "the care, protection, and wholesome mental and physical development of the child" can occur in a family environment as the purpose of the Juvenile Act directs. 42 Pa.C.S. § 6301(b).

11

*In re M.L.*, 757 A.2d 849, 851 (Pa. 2000) (emphasis added) (quoting *In Interest of Justin S.,* 543 A.2d 1192, 1200 (Pa. Super. 1988)). I read this provision as dictating a particular result after a dependency action has been commenced. Yet, fairly read, this holding creates the impression that, in circumstances like that of B.S., a post-deprivation hearing would be, at best, perfunctory.

Second, the County argued that *In re ML* and the Pennsylvania statutes made the dependency process inapplicable to their summary and order procedure.[4] As a result, I query whether there existed a sufficiently confusing environment that would cause a reasonable caseworker to mistakenly conclude that a post-deprivation hearing was not required here. I conclude that this is the case. *See O'Brien v. City of Grand Rapids,* 23 F.3d 990, 1004 (6th Cir. 1994) ("The policy, practice, or custom was taught by a national authority on the management of critical incidents, a person upon whom it was not unreasonable to rely. The officers' response, which did not vary from the policy, practice, or custom, entitles them to qualified immunity."). Although the right to a post-deprivation hearing is deeply embedded in our society, we cannot expect caseworkers to parse state supreme court precedent and interpret state law in a way that is contrary to an accepted agency custom. In light of the confusing legal landscape that exists, it was not unreasonable for Barth and Eller to rely upon an established agency custom to guide their handling of the case. For this reason I conclude that the District Court properly determined that Eller and

---

[4] I am also aware of the pervasive concern for acting in the best interest of the child.

Barth have qualified immunity and are protected from section 1983 liability for the failure to provide B.S. with a post-deprivation hearing.

*Remand on Damages for the May 5, 2006 Meeting*

I also disagree with the scope of the majority's remand regarding the County's liability on the procedural due process violation arising from the May 5, 2006 meeting. I concur with their conclusion that nominal damages are substantiated, but disagree that further damages may be appropriate. The majority concluded that there was a factual dispute about M.N.'s weight on the day that the County removed her from B.S.'s custody. I see no such dispute.

My disagreement with the majority is focused upon a single point of reference in the record: M.N.'s weight on May 5, 2006, the day she was removed from B.S.'s house. There is no dispute that the records specify M.N.'s weight on that day as 22 pounds, 2 ounces. However, Eller, who was present at the medical exam on that day, stated that M.N. was clothed during this weigh-in. No one disputes this, nor do they dispute the fact that prior weights were taken when the child was not clothed.

M.N.'s pediatrician testified only that, in his practice, children were usually weighed without clothes. Yet, he was not present for M.N.'s weigh-in on May 5, 2006 and, significantly, he never challenged Eller's testimony that, in essence, his protocol was not followed on that occasion. It is axiomatic that, in the absence of any challenge to Eller's factual statement, B.S. failed to create a factual dispute.

13

B.S.'s argument, therefore, is that the court would not have ordered M.N.'s removal, or would have immediately returned M.N. to her, if she had been able to present this weight to the court—even though the weight was taken while M.N. was clothed. In light of the Dr. Lindblad's diagnosis and report, [5] and other information before the court at that time, I do not regard such an inference as reasonable. [6] For

---

[5] At deposition, B.S. presented Dr. Lindblad with a hypothetical in which M.N.'s weight was *actually* 22 pounds, 2 ounces on May 5. Under this hypothetical, Lindblad stated that, while failure to thrive diagnoses are based upon a trend of data rather than a discreet data point, he would have to take this information into account before deciding on a failure to thrive diagnosis. Yet, as with M.N.'s pediatrician, B.S. never asked Dr. Lindblad to consider the actual data that included the weight of M.N.'s clothes. Lindblad never commented on the real data. (Interestingly, however, Linblad detected that the hypothetical was flawed because he stated that such a hypothetical weight would have been highly suspect to him because it diverged so greatly from M.N.'s prior growth.) The majority's use of Lindblad's testimony to suggest that he retracted his diagnosis and ChildLine complaint diverges from fact.

[6] B.S. fails to raise a dispute of material fact about the fundamental assertion made in Eller's summary that she presented to the court: Dr. Lindblad diagnosed M.N. with psycho-social failure to thrive due to chronic low weight gain that, from clinical observation of both M.N. and B.S., likely was caused by B.S.'s conduct. The court's decision to remove M.N. from B.S.'s custody was ultimately based on this observation and diagnosis. Nothing stated in any of the

14

this reason, I conclude that there is no basis to send the issue of damages to a jury. I would, instead, remand with instruction for the District Court to award nominal damages.

*June 23, 2006 Ex Parte Meeting*[7]

reports of the doctors or caseworker specifically addresses, much less refutes, any of this. Moreover, clarification of Eller's reference to 19 pounds would not have materially changed anything. This is so because, even if B.S. could have produced credible evidence of a different weight—the weights taken, for instance, by either of the two physicians who examined M.N. in late April—the evidence would still have supported a conclusion that M.N. was severely underweight while under the care of B.S.

[7] In a footnote, B.S. generally states that Eller's decisions "had to have the approval of her supervisor and Agency policy-makers before it could be extended." Yet, as to the June 23, 2006 meeting, B.S. failed to detail any specific challenge to the grant of summary judgment in favor of Barth. I am aware that, under section 1983, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center,* 372 F.3d 572, 586 (3d Cir. 2004); *see also Santiago v. Warminster Twp.,* 629 F.3d 121, 129 (3d Cir. 2010). In this case, however, B.S.'s failure to raise a specific challenge as to Barth waives the issue of the District Court's decision

15

As to the June 23, 2006 meeting between Eller and Judge Cascio, I disagree with the majority that there is any basis to extend absolute immunity to Eller on the procedural due process claim. Like the May 5 meeting, even if I agreed that the conduct can be analogized as prosecutorial, Eller had no authority to approach the court to propose another custody order. As a result, there is no basis for absolute immunity.

### *Qualified Immunity*

My disagreement with the majority on the June 23 meeting goes further in that I would not extend even qualified immunity to Eller. As I noted in the discussion of the May 5, 2006 meeting, the constitutional protection against ex parte meetings is well-established. I concluded that qualified immunity was due in that instance, however, because of the combination of a confusing legal landscape and a County custom that misguided the caseworkers actions. Yet, for the June 23, 2006 meeting, there was no applicable County custom. This, to me, is decisive. Eller, acting in discernibly non-emergency circumstances, made the decision to meet ex parte with Judge Cascio on June 23. There is no evidence to suggest that Eller did so at the behest of any County authority, nor was she ordered to do so by the court. Therefore, I must conclude that she acted on her own. Accordingly, there is no basis to conclude that Eller made a reasonable mistake by approaching Judge Cascio ex parte.

---

granting qualified immunity to Barth for liability arising from the June 23, 2006 meeting with the court.

16

Nonetheless, as with the May 5, 2006 ex parte meeting, I would award only nominal damages because there is no reasonable basis to infer that the outcome of the meeting would have been different if B.S. had been given the opportunity to confront the evidence.

As with the May 5 meeting, the inquiry on the June 23 meeting focuses on whether B.S.'s inability to confront information provided at the meeting prejudiced the outcome.[8] Yet, as I noted in my analysis of injury arising from B.S.'s

---

[8] Eller gave the court the summary and proposed order, neither of which provided any details about the investigation. The summary stated only that upon completion of its investigation regarding serious physical neglect, "[t]he CY-48 was filed on June 19, 2006 with Childline and substantiated [B.S.], the natural mother, as the perpetrator." The proposed order stated only that "due to the indicated report of serious physical neglect whereby B.S. is the perpetrator, it is hereby ordered . . . ." Nonetheless, by the time of the second hearing the County had completed its CY-48 investigation, determining that Lindblad's accusation of child neglect by B.S. was "indicated." B.S. plainly disputes the conclusion of the summary given to the court and disagrees with the custody recommendation, but the focus of her challenge is with information that is contained in or left out of the CY-48. For the sake of summary judgment—since the report was filed before the hearing—I would assume that B.S. had an opportunity to read it and formulate the objections that she voices in this appeal. Moreover, I would presume that her presence at the June 23 meeting would have provided her with a forum to raise numerous issues with the investigation.

17

other procedural due process claim, I do not find any reasonable basis for the District Court to have inferred that the state court would have made a decision more favorable to B.S. based upon the weight record from the May 5 doctor appointment. The state court's ignorance of this record was of no moment. The same reasoning applies here.[9]

As to the May 8 weight record, according to Eller, the natural father reported the child was also clothed during this weigh-in. However, even were we to disregard Eller's undisputed testimony here because she was not physically present at the examination, I note that this weight was taken after M.N had been in the custody and care of her natural father for three days. As a result, it would not have been reasonable for the District Court to construe this weight record as evidence favorable to B.S.'s claims of constitutional harm, since –objectively—it arose from the period of time in which the natural father, not B.S., had custody of M.N.

We are required to make only reasonable inferences at summary judgment.

Because B.S.'s issues with the CY-48 are predicated on the May 5 and May 8 weights, weights that do not support B.S.'s claims, I must conclude that all of the issues that B.S. raises regarding the report are baseless. Therefore, lacking any reasonable challenge to Eller's recommendation, there is no evidentiary support for actual prejudice arising from the

---

[9] There is no evidence that this record was actually submitted with the CY-48. For purposes of summary judgment, I presume that it was.

June 23 meeting between Eller and the state court and, therefore, no evidence of actual, compensable, harm. Yet, as with the May 5, 2006 procedural due process violation, I would remand to the District Court with instructions to award nominal damages.

*Substantive Due Process Claim*[10]

As to the substantive due process claim, I agree with the majority that, as to B.S.'s substantive due process claims arising from M.N.'s removal, no reasonable fact-finder could rule that Eller's actions shock the conscience. I differ from both of my colleagues, however, in reaching the same conclusion for all of B.S.'s substantive due process claims. I, therefore, do not reach the issue of absolute immunity on this issue.

Eller acted originally upon the report of one of M.N.'s attending physicians, who had sustained contact with both M.N. and B.S. over a period of time. Moreover, the physician's suspicions of serious neglect arose from observations he made that were grounded in his field of medical expertise. Eller's subsequent investigation gathered a large amount of data, which provided a very consistent description of M.N. as one who was severely underweight while under the care of B.S. and who gained weight appropriately while under the care and supervision of others. Finally, while the weight of 22 pounds, 2 ounces is,

---

[10] I agree with the majority that that B.S. waived the substantive due process issue as to Barth and the County.

19

technically, over the threshold for a failure to thrive diagnosis, the margin by which it exceeds it is extremely slight. Additionally, the weight from May 5 (and the May 8 weight) is a notable outlier when charted with all of M.N.'s recorded weights. This is important in light of Lindblad's testimony that his assessment arose from long-term patterns that he observed, rather than discrete data points. Viewed in this larger context, even if I could have concluded that Eller mishandled the May 5 or May 8 weight records, her misstatement or misjudgments could hardly be regarded as egregious or conscience shocking.

B.S. attempts to tie all of the alleged errors together by claiming that Eller had an agenda throughout this time to deprive her of custody in favor of the natural father. The problem, however, is that B.S. did not substantiate this theory. She pointed to one possibly uncommon statement in the May 5 order requiring her to refrain from "badgering or harassing the agency staff, belitteling [sic] any service providers or the natural father." She claims that this is evidence that Eller had a negative view of her. Yet, B.S. fails to produce any evidence from which the District Court could have reasonably inferred such an agenda against her, much less a causal link to the caseworker's conduct. Without this, her entire substantive due process claim fails.

Accordingly, I do not find any error in the District Court's decision to grant summary judgment in favor of Eller regarding B.S.'s substantive due process claims.

20